Melvin GRAHAM, Petitioner–Appellee,

v.

Robert HOKE, Superintendent, Eastern Correctional Facility, Robert Abrams, Attorney General of the State of New York, and Charles J. Hynes, District Attorney, Kings County, Respondents,

Robert Hoke, Superintendent, Eastern Correctional Facility, Respondent–Appellant.

No. 1670, Docket 91–2094.

United States Court of Appeals, Second Circuit.

Argued June 19, 1991.

Decided Oct. 3, 1991.

Rehearing Denied Oct. 21, 1991.

Lindsay Brown, Asst. Dist. Atty., Brooklyn, N.Y. (Charles J. Hynes, Dist. Atty., Jay M. Cohen, Asst. Dist. Atty., of counsel), for appellants.

Ronald Cohen, New York City, for petitioner-appellee.

Before MESKILL, KEARSE and McLAUGHLIN, Circuit Judges.

MESKILL, Circuit Judge:

This is an appeal from a judgment of the United States District Court for the Eastern District of New York, Nickerson, J., entered on December 17, 1990. The district court granted appellee Melvin Graham's (Graham) petition pursuant to 28 U.S.C. § 2254 for a writ of habeas corpus and ordered his release unless the State of New York chose to commence a new trial against him within ninety days from the entry of judgment. *Graham v. Hoke*, 751 F.Supp. 1073 (E.D.N.Y.1990). Graham currently is incarcerated and is in the custody of the State of New York pursuant to a 1982 conviction for murder in the second degree and robbery in the first degree.

In his habeas petition, Graham attacked this New York state conviction. He asserted that in light of the decision of the United States Supreme Court in *Cruz v. New York*, 481 U.S. 186, 107 S.Ct. 1714, 95 L.Ed.2d 162 (1987), his conviction was obtained in violation of federal constitutional law. In *Cruz*, the Supreme Court held that the Confrontation Clause of the Sixth Amendment bars the admission of an interlocking confession of a nontestifying codefendant that would not be directly admissible against the defendant even if the jury is instructed that the confession cannot be considered against the defendant, and even if the defendant's own confession was admitted in evidence. *Id.* at 193, 107 S.Ct. at 1719.

The district court concluded that the rule announced by the Supreme Court in *Cruz*, whether it be characterized as an "old" or "new" rule of constitutional criminal procedure, should be applied retroactively. *Graham*, 751 F.Supp. at 1074. The court held that the admission of the confession of Graham's codefendant was not harmless error and ordered Graham released unless the state retried Graham within ninety days. *Id.* at 1075. New York appeals from that decision.

We agree with the district court that the *Cruz* rule should be applied retroactively. After reviewing the record, however, we disagree with the district court's decision to grant the habeas petition. Given the strength of the other evidence against Graham, we conclude that the introduction of his codefendant's interlocking confession was harmless error. Accordingly, we reverse and remand to the district court with instructions to dismiss the petition.

## BACKGROUND

The actions that underlie this case occurred during the early morning hours of December 19, 1981. On that morning, at approximately 4:30 a.m., Graham and two of his companions, Darryl Green (Green)

and Benjamin Stephens (Stephens), went to Super Jack's Burger Store (Super Jack's), a fast food restaurant located in Brooklyn, New York, to get something to eat. While in Super Jack's, Green noticed an unknown male enter the restaurant to use the public telephone. That individual was wearing two gold rings and appeared to have some money. Green approached Graham and Stephens and suggested that they follow the man out of Super Jack's and rob him of his jewelry and money. Graham and Stephens agreed to participate in this robbery.

The confederates followed the man, later identified as Ronald Sanders (Sanders), out of Super Jack's and down Reed Street toward Fulton Street. They eventually caught up with Sanders and Graham shouted at him to stop. Sanders defied this directive and continued on his way. In response, Graham, who was carrying a .32 caliber handgun and who had had a "few beers," fired three shots at Sanders but missed him. Sanders began to run to evade his pursuers and he eventually sought refuge in the subway station located at Utica Avenue. Graham and his confederates followed.

Once inside the subway station, Sanders approached the token booth attendant, Claude Watson, Jr. (Watson), and asked him to call a police officer. Sanders shouted: "Where's a cop? They're trying to rip me off upstairs." Sanders then ran to the public telephone located inside the Utica Avenue station. In response to Sanders' request for assistance, Watson triggered the emergency alarm located inside the token booth to notify the Transit Authority that an emergency existed. He also picked up the emergency telephone to advise the Transit Authority of what was happening.

Graham, Stephens and Green entered the subway station and spotted Sanders who was still at the public telephone with the receiver in his hand. Graham stood directly in front of Sanders. Stephens stood behind an old phone booth located next to the public telephone that Sanders was using. Green stood behind the token booth. It was at this point that the fateful events of December 19, 1981 unfolded.

Graham approached Sanders and told him to "give it up." Sanders reacted to this demand by slamming down the telephone receiver and moving toward Graham. Graham then once again pulled his handgun and began to fire at Sanders' chest. Sanders grabbed his chest and staggered toward the token booth where he eventually collapsed. Graham ran toward the stairway leading out of the Utica Avenue station. Green, however, ran to the spot where Sanders had fallen, turned Sanders' body over, and removed the rings from his fingers. Stephens left his spot behind the old telephone booth and moved to the area behind the token booth. He then approached Sanders' body, removed the wallet from Sanders' pocket, took something from the wallet, and threw the wallet down beside the victim. Stephens and Green then ran up the stairway that leads to Utica Avenue.

By this time, Transit Police Officer Paul Perpall had reached the Utica Avenue station. He found Sanders lying next to the token booth surrounded by two or three civilians. Watson, the token clerk, was still in the booth. Officer Perpall approached the victim, determined that Sanders was still breathing, and called for an ambulance. Within a few minutes, two Transit Police patrol cars arrived at the Utica Avenue station. Because the ambulance had yet to arrive, Officer Perpall, the other officers and some civilians carried Sanders up the stairs and placed him in a patrol car. The officers then brought Sanders to St. John's Hospital where he later died.

The Transit Police, in conjunction with the New York City police, initiated an investigation into Sanders' death. The primary sources of information were the token booth attendant, Watson and a civilian, John Ford (Ford), who was present in the Utica Avenue station at the time of the shooting. Based on the information obtained from these and other sources, the police soon centered their attention on Green, Graham and Stephens and eventually brought each one in for questioning. Green was placed in a lineup and was identified by Ford as being the individual who

was behind the token booth during the shooting and who had taken the rings from Sanders' hand.[1]

At approximately 4:30 a.m. on December 22, 1981 Stephens was located and was taken to the 81st Precinct for questioning. There Stephens was questioned by Detective Gerald Gallagher in the presence of Detective Ernest Bostic. Stephens was advised of his constitutional rights and voluntarily waived them. During the course of his discussion with the detectives, Stephens orally admitted to his involvement in the attack on Sanders. Detective Gallagher memorialized Stephens' oral confession on paper, going through the statement with Stephens line by line. Stephens reviewed the written statement and signed it. Detectives Gallagher and Bostic also signed the statement to indicate that they were present when it was made.

Similarly during the early morning hours of December 22, Graham was brought to the 81st Precinct by Detective Gerald Molloy. While being transported, Detective Molloy advised Graham of his constitutional rights and instructed him not to say anything until he got to the Precinct. Rejecting the detective's advice, Graham proceeded to "mumble" that he had shot Sanders and stated "I knew this was going to happen. I knew this was going to happen." At the Precinct, Graham met with Detectives Gallagher and Bostic and was once again advised of his constitutional rights. Graham voluntarily waived his rights and orally confessed to having shot Sanders on the morning of December 19, 1981. Subsequently, he signed a written statement that recounted the events of that fateful morning. Graham admitted to having fired three shots at Sanders prior to Sanders' attempt to seek refuge in the Utica Avenue station. He also admitted to having fired the shots that resulted in Sanders' death. Graham stated that when confronted in the station Sanders slammed the telephone receiver, said "I'm tired of this shit," and then charged at him. It was at this point that Graham pulled his weapon and began to fire. Graham further stated that after the shooting he immediately returned to his "block" and attempted to discard the pistol. He eventually sold the pistol to a "Rastafarian West Indian guy" for "forty dollars and two nickel bags of reefers."

At approximately 11:30 a.m. on December 22, 1981 both Graham and Stephens were placed in lineups. Ford, an eyewitness, was unable to identify either Graham or Stephens.[2] Watson, the token booth attendant, however, identified both Graham and Stephens. The lineups were recorded and were conducted under the supervision of Assistant District Attorney Debra Graves (Graves). Once Graham and Stephens were identified, the Assistant District Attorney made arrangements for a videotaped interview session with each suspect. Graham and Stephens independently gave videotaped statements and admitted to their involvement in the Sanders shooting. Assistant District Attorney Graves then authorized their arrest.

A four count indictment was returned charging Graham and Stephens with, *inter alia,* Murder in the Second Degree/Intentional Murder, Robbery in the First Degree, and Murder in the Second Degree/Felony Murder. Prior to trial, Graham objected to having a joint trial with his codefendant Stephens. Graham argued that because the prosecution was likely to introduce Stephens' confession, which identified Graham as having fired the fatal shots, severance was required under the Supreme Court's decision in *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Graham asserted that his Sixth Amendment right of confrontation would be violated by the introduction of Stephens' confession, given the unlikely prospect of Stephens' choosing to testify at trial. The state trial court rejected this

---

**1.** At the time of his arrest, Green had in his possession a ring later identified as belonging to Sanders. Green was tried separately on charges relating to the Sanders robbery and shooting. He was convicted. The disposition of the charges against Green are not relevant to the issue currently before us.

**2.** As previously noted, Ford did identify Green as having been a participant in the crime.

argument concluding that both the written and videotaped statements of the two defendants "interlocked to such a degree as to obviate any [*Bruton*] problem."

Pursuant to the trial court's ruling, Graham and Stephens proceeded to trial on November 22, 1982. At trial, the prosecution introduced the testimony of the two known eyewitnesses to the shooting, Ford and Watson. Additionally, the officers and the Assistant District Attorney involved in investigating the case and obtaining the confessions of both defendants were presented as witnesses. Finally, once again over the objection of Graham's counsel, the written and videotaped confessions of both Graham and Stephens were introduced into evidence. The videotaped confessions were played for the jury.

Graham offered no defense case. However, trial counsel, based on the content of Graham's own confession, argued that Graham was intoxicated at the time of the shooting. Accordingly, the trial court, when charging the jury on the offense of Murder in the Second Degree/Intentional Murder, included an instruction on the lesser-included offense of Second Degree Manslaughter.

Moreover, the trial court carefully instructed the jury regarding the use of the confessions of both Graham and Stephens.

> Your verdict does not have to be the same in each case or against both of the defendants.
>
> In this regard you will recall that certain alleged confessions have been received in evidence as to each of the defendants, and I charge you that these alleged confessions or statements have been received in evidence only against the particular defendant who is claimed to have made them and must be considered as evidence only against him. You may not consider a confession or statement of one defendant against his co-defendant.
>
> Therefore, in your evaluation of the evidence against Melvin Graham, you may consider the statement or confession allegedly made by him, but you may not consider the statement or confession allegedly made by Benjamin Stephens.

The jury was charged during the afternoon of November 29, 1982 and deliberated until approximately 10:00 p.m. that evening. Deliberations recommenced on the morning of November 30. At 1:00 p.m. that afternoon, the jury sent a note asking to see the signed statement of each of the defendants. Photocopies of the two statements were provided to the jury.[3] At approximately 2:45 p.m., the jury returned its verdicts. With respect to the charges against Graham, the jury found him not guilty of Murder in the Second Degree/Intentional Murder and of the lesser-included offense of Manslaughter in the Second Degree. However, the jury returned a verdict of guilty on the charges of Robbery in the First Degree and Murder in the Second Degree/Felony Murder. Stephens was convicted of the same charges.

On January 10, 1983 the trial court sentenced Graham as a second violent felony offender to concurrent terms of imprisonment of twenty-five years to life on the felony murder count and twelve and one-half to twenty-five years to life on the robbery count. Graham appealed his conviction to the Appellate Division, Second Department, arguing, *inter alia*, that his motion for severance should have been granted by the trial court given the incriminating nature of his codefendant's confession. On May 12, 1986 the Appellate Division rejected this claim and affirmed the judgment of conviction. The court reasoned that the statements of Graham and Stephens "while cross-inculpatory to some degree, were so similar that they interlocked; therefore, it is unlikely that any prejudice to this defendant resulted from the admission of his codefendant's confession." *People v. Graham*, 120 A.D.2d 611, 611, 502 N.Y.S.2d 83, 84 (2d Dep't 1986) (citations omitted). On September 12, 1986 leave to appeal to the New York Court of Appeals was denied. 68 N.Y.2d 812, 507 N.Y.S.2d 1030, 499 N.E.2d 879 (1986).

---

**3.** Stephens' written statement was redacted by the consent of the parties to excise certain statements referring to the victim's appearance immediately following the shooting.

On February 20, 1987 Graham sought to attack collaterally his conviction under N.Y.Crim.Proc. Law § 440.10 (McKinney 1983) in the New York Supreme Court, Kings County. In his motion to vacate the judgment of conviction, Graham claimed that he had been denied the effective assistance of appellate counsel. On May 7, 1987 Graham's motion was denied.

On April 21, 1987 the United States Supreme Court decided *Cruz v. New York*, 481 U.S. 186, 107 S.Ct. 1714. The *Cruz* Court held that it is error to admit during a joint trial the confession of a nontestifying codefendant that would not be directly admissible against the defendant, even if limiting instructions are given and even if the codefendant's confession "interlocks" with that of the defendant. *Id.* at 193, 107 S.Ct. at 1719. In response to that decision, Graham filed a second section 440.10 motion to vacate his conviction. Graham contended that *Cruz* was directly applicable to his case and that the decision should be applied retroactively. New York Supreme Court, Kings County, Justice Ronald A. Zweibel considered Graham's motion. In a decision dated May 18, 1988 Justice Zweibel agreed with Graham that *Cruz* should be applied retroactively, but concluded that any error resulting from the admission of Stephens' confession was rendered harmless given the nature of Graham's own confessions and the weight of the other evidence against him. *People v. Graham*, 140 Misc.2d 417, 428–29, 531 N.Y.S.2d 172, 177–79 (Sup.Ct.1988). The Appellate Division, Second Department, affirmed this decision, noting that Graham's confessions were "detailed and comprehensive, and satisfactorily explained his part in the crime." 158 A.D.2d 714, 714, 552 N.Y.S.2d 162, 162 (2d Dep't 1990). Moreover, the court held that "the overwhelming evidence of the defendant's guilt renders any error in admitting the codefendant's 'interlocking' confession harmless beyond a reasonable doubt." *Id.* On May 1, 1990 leave to appeal to the New York Court of Appeals was denied. 76 N.Y.2d 735, 558 N.Y.S.2d 897, 557 N.E.2d 1193 (1990).

On June 6, 1990 Graham, having exhausted his claims in the New York state courts, initiated this action pursuant to 28 U.S.C. § 2254 seeking a writ of habeas corpus in the United States District Court for the Eastern District of New York. The district court focused on Graham's *Cruz* claim. Specifically, the district court, recognizing that *Cruz* was decided after Graham's trial and after his direct appeals had been rejected, examined the issue of whether Graham could avail himself of the rule of criminal procedure announced in *Cruz*. The fundamental question addressed was whether the *Cruz* rule should be applied retroactively to Graham's conviction and, if so, whether the admission of the codefendant's confession was harmless error. *See Graham v. Hoke*, 751 F.Supp. at 1074.

In analyzing the retroactivity issue, Judge Nickerson relied on an earlier opinion written by Judge Stanton, *see Reddy v. Coombe*, 730 F.Supp. 556, 565–66 (S.D.N.Y.), *aff'd on other grounds*, 916 F.2d 47 (2d Cir.1990). Judge Nickerson concluded that the *Cruz* rule, whether it be characterized as a "new" or "old" rule of criminal procedure, should be applied retroactively. *Graham*, 751 F.Supp. at 1074. The district court held that the admission of Stephens' confession was error and that the error was not harmless beyond a reasonable doubt. Several factors provided the basis for the district court's decision: (1) trial counsel called into question the voluntariness of Graham's confession, (2) the prosecutor in his closing argument emphasized that the statements of Stephens and Graham "matched," (3) Stephens' confession was more detailed than Graham's, and (4) prior to returning its verdicts the jury asked to see the written statements of both defendants and these were the only exhibits requested. *Id.* at 1075. Accordingly, the district court granted Graham's habeas petition and ordered that Graham be released unless the State of New York instituted new trial proceedings against him within ninety days from the date of the court's order. *Id.* Judgment to that effect was entered on December 17, 1990.

On January 8, 1991 the State of New York filed a notice of appeal challenging

the district court's judgment granting the petition. By motion dated January 18, 1991, the State of New York requested the district court to stay pending resolution of this appeal its judgment granting the habeas petition. On January 31, 1991 the district court issued a Memorandum and Order granting the stay.

## DISCUSSION

■ The threshold issue we must address is whether the rule announced in *Cruz* is available to defendants like Graham whose convictions became final prior to the date of the *Cruz* decision. Resolution of this complex question requires us to examine the evolution of the law regarding the admission of a nontestifying codefendant's confession.

### A. The Supreme Court Precedent

The *Cruz* decision cannot be viewed in isolation. Prior to its decision in *Cruz*, the Supreme Court decided two cases that directly dealt with the issue of the admissibility of a nontestifying codefendant's confession. *See Bruton*, 391 U.S. 123, 88 S.Ct. 1620; *Parker v. Randolph*, 442 U.S. 62, 99 S.Ct. 2132, 60 L.Ed.2d 713 (1979).

*Bruton* involved a joint trial of two individuals who had been charged with the armed robbery of a post office. One of the defendants, prior to trial, confessed to the crime and his confession inculpated the second defendant, Bruton. Bruton, however, did not admit to involvement in the offense. Neither Bruton nor his codefendant testified at trial. The codefendant's confession was introduced through the testimony of a postal inspector. The inspector testified that the codefendant had orally confessed to having participated in the robbery and had identified Bruton as his accomplice. The district court instructed the jury that the confession could only be considered against the codefendant and that it could not be used when determining Bruton's guilt or innocence. Bruton ultimately was convicted by the jury and he appealed his conviction. The Eighth Circuit, relying on *Delli Paoli v. United States*, 352 U.S. 232, 77 S.Ct. 294, 1 L.Ed.2d 278 (1957), affirmed his conviction. The Supreme Court then granted *certiorari*.

In *Delli Paoli*, the Supreme Court held that the admission of a nontestifying codefendant's confession that implicated another defendant was constitutionally permissible where the jury is instructed that the confession can only be considered when assessing the guilt of the codefendant who made the statement. *Id.* at 239–43, 77 S.Ct. at 298–301. Explicitly overruling its decision in *Delli Paoli*, the Supreme Court in *Bruton* held that the introduction of the nontestifying codefendant's confession "posed a substantial threat to [Bruton's] right to confront the witnesses against him." *Bruton*, 391 U.S. at 137, 88 S.Ct. at 1628–29. The Court explained its decision to reverse Bruton's conviction in the following manner:

> Despite the concededly clear instructions to the jury to disregard [the codefendant's] inadmissible hearsay evidence inculpating [Bruton], in the context of a joint trial we cannot accept limiting instructions as an adequate substitute for [Bruton's] constitutional right of cross-examination. The effect is the same as if there had been no instruction at all.

*Id.* (citations omitted). The *Bruton* Court, recognizing that it would be impossible to determine whether the jury had in fact followed the district court's instruction not to consider the codefendant's confession when it assessed Bruton's guilt, adopted a very practical approach to the problem. The Court reasoned:

> [T]here are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored. Such a context is presented here, where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial. Not only are the incriminations devastating to the defendant but their credibility is inevitably suspect, a fact recognized when ac-

complices do take the stand and the jury is instructed to weigh their testimony carefully given the recognized motivation to shift blame onto others. *The unreliability of such evidence is intolerably compounded when the alleged accomplice, as here, does not testify and cannot be tested by cross-examination. It was against such threats to a fair trial that the Confrontation Clause was directed.*

*Id.* at 135–36, 88 S.Ct. at 1627–28 (citations and footnotes omitted) (emphasis added). Thus, the Court determined that Bruton's right to confront the evidence being offered against him had been improperly infringed and reversed his conviction.

Following the Supreme Court's decision in *Bruton,* a number of Courts of Appeals, including our own, recognized an exception to the *Bruton* rule when both the defendant and the codefendant had confessed to the crime charged and the confessions "interlocked"—were factually consistent. *See, e.g., Mack v. Maggio,* 538 F.2d 1129, 1130 (5th Cir.1976); *United States ex rel. Stanbridge v. Zelker,* 514 F.2d 45, 48–49 (2d Cir.), *cert. denied,* 423 U.S. 872, 96 S.Ct. 138, 46 L.Ed.2d 102 (1975); *United States v. Spinks,* 470 F.2d 64, 65–66 (7th Cir.), *cert. denied,* 409 U.S. 1011, 93 S.Ct. 456, 34 L.Ed.2d 305 (1972). Other Circuits rejected this exception to the *Bruton* rule. *See, e.g., Hodges v. Rose,* 570 F.2d 643, 647–48 (6th Cir.), *cert. denied,* 436 U.S. 909, 98 S.Ct. 2244, 56 L.Ed.2d 408 (1978); *United States v. DiGilio,* 538 F.2d 972, 982 (3d Cir.1976), *cert. denied sub nom. Lupo v. United States,* 429 U.S. 1038, 97 S.Ct. 733, 50 L.Ed.2d 749 (1977). The Supreme Court set out to resolve this conflict among the Circuits in *Parker,* 442 U.S. 62, 99 S.Ct. 2132.

*Parker* involved a multiple defendant felony murder trial. The prosecution stemmed from a murder that occurred when a planned robbery went awry. Upon being arrested, each of the defendants confessed to his involvement in a scheme to rob the murder victim. At trial the confession of each of the nontestifying defendants was admitted into evidence through the testimony of several police officers. The Tennessee trial court instructed the jury that each confession could be used only against the defendant who had given it and could not be considered as evidence of a codefendant's guilt. All of the defendants were convicted and sentenced to life imprisonment. The Tennessee Court of Criminal Appeals reversed the convictions of the nontestifying defendants holding, *inter alia,* that admission of the confessions at a joint trial violated the *Bruton* rule. The Tennessee Supreme Court reversed the decision of the Court of Criminal Appeals and reinstated the convictions, holding that the *Bruton* rule was inapplicable in situations where all the defendants had confessed and those confessions "interlocked." *See Parker,* 442 U.S. at 66–68, 99 S.Ct. at 2135–37. The defendants filed federal habeas petitions and the district court granted those petitions, holding that *Bruton* precluded the introduction of the confessions. The Sixth Circuit agreed with the district court's analysis of the *Bruton* issue and affirmed.

In *Parker* a sharply divided Supreme Court in a plurality opinion authored by then Associate Justice Rehnquist, reversed the Sixth Circuit's decision.[4] Justice Rehnquist framed the issue to be decided: "[W]hether *Bruton* requires reversal of a defendant's conviction when the defendant himself has confessed and his confession 'interlocks' with and supports the confession of his codefendant." *Id.* at 64, 99 S.Ct. at 2135. Writing on behalf of himself and three other members of the Court, Justice Rehnquist reasoned that the concerns that gave rise to the *Bruton* decision were not present when each defendant has independently confessed to the offense and

---

**4.** A majority of the Supreme Court agreed that the Sixth Circuit erred in concluding that the defendants' habeas petitions had been properly granted. Only four of the Justices held that there can be no violation of the *Bruton* rule when interlocking confessions are admitted.

Justice Blackmun concurred in the judgment reasoning that the *Bruton* violation was harmless error given the specific facts of the case. Three Justices dissented and one Justice did not participate in the decision.

those confessions are factually consistent. He stated:

> [T]he incriminating statements of a codefendant will seldom, if ever, be of the "devastating" character referred to in *Bruton* when the incriminated defendant has admitted his own guilt. The right protected by *Bruton*—the "constitutional right of cross-examination"—has far less practical value to a defendant who has confessed to the crime than to one who has consistently maintained his innocence. Successfully impeaching a codefendant's confession on cross-examination would likely yield small advantage to the defendant whose own admission of guilt stands before the jury unchallenged. Nor does the natural "motivation to shift blame onto others," recognized by the *Bruton* Court to render the incriminating statements of codefendants "inevitably suspect" require application of the *Bruton* rule when the incriminated defendant has corroborated his codefendant's statements by heaping blame onto himself.

*Id.* at 73, 99 S.Ct. at 2139 (citations omitted). Thus a plurality of the *Parker* Court held that the *Bruton* rule was not violated through the admission of interlocking confessions, assuming proper limiting instructions to the jury. *Id.* at 75, 99 S.Ct. at 2140. The Court, however, given Justice Blackmun's limited concurrence, was evenly divided on the interlocking confession issue.

The *Parker* plurality's exposition of the *Bruton* issue in the context of interlocking confessions remained unaltered until the Supreme Court again addressed the issue in *Cruz*, 481 U.S. 186, 107 S.Ct. 1714. The situation in *Cruz* was almost identical to that in *Parker*. Two defendants both allegedly confessed to crimes prior to trial and the New York trial court allowed those confessions to be introduced into evidence at their joint trial. The trial court, however, did instruct the jury that when assessing guilt each confession had to be viewed in isolation and could only be used against the defendant who had given it. Both defendants were convicted. Relying on the plurality opinion in *Parker*, the New

York Court of Appeals held that the defendants' confessions interlocked and that it was not error to have admitted the codefendant's confession. *Id.* at 189, 107 S.Ct. at 1717.

Stressing the fundamental importance of the right of confrontation guaranteed by the Sixth Amendment, a majority of the *Cruz* Court rejected the *Parker* plurality's analysis. Instead the *Cruz* Court endorsed the view that Justice Blackmun had offered in his concurrence in *Parker*. *Cruz*, 481 U.S. at 191, 107 S.Ct. at 1718. Justice Blackmun had stated that while introduction of an interlocking confession can be harmless error it is nonetheless a violation of the Confrontation Clause. *Id.*

The *Cruz* Court found the *Parker* plurality's reasoning to be fatally flawed. In particular, the Court declined to accept the proposition that in order to establish a violation of the *Bruton* rule introduction of a codefendant's confession must be "devastating" to the defendant's case. *Id.* The Court declared:

> In fact, it seems to us that "interlocking" bears a positively inverse relationship to devastation. A codefendant's confession will be relatively harmless if the incriminating story it tells is different from that which the defendant himself is alleged to have told, but enormously damaging if it confirms, in all essential respects, the defendant's alleged confession. It might be otherwise if the defendant were *standing by* his confession, in which case it could be said that the codefendant's confession does no more than support the defendant's very own case. But in the real world of criminal litigation, the defendant is seeking to *avoid* his confession—on the ground that it was not accurately reported, or that it was not really true when made.... The law cannot command respect if such an inexplicable exception to a supposed constitutional imperative is adopted. Having decided *Bruton,* we must face the honest consequences of what it holds.

*Id.* at 192–93, 107 S.Ct. at 1718–19. It is against this landscape that we must view Graham's collateral attack on his New York state conviction.

## B. *Old Rule or New Rule*

There is no question that Graham's New York state conviction became final prior to the decision in *Cruz*. A conviction becomes final when "the judgment of conviction was rendered, the availability of appeal exhausted, and the time for petition for certiorari ... elapsed." *Allen v. Hardy*, 478 U.S. 255, 258 n. 1, 106 S.Ct. 2878, 2880, n. 1, 92 L.Ed.2d 199 (1986) (per curiam) (quoting *Linkletter v. Walker*, 381 U.S. 618, 622 n. 5, 85 S.Ct. 1731, 1734 n. 5, 14 L.Ed.2d 601 (1965)). It was on May 12, 1986 that leave to appeal to the New York Court of Appeals was denied and Graham never filed a petition for *certiorari; Cruz* was decided on April 21, 1987. Thus, as this case is currently postured, Graham is collaterally attacking his conviction contending that he is entitled to the benefit of a decision announced after his New York state conviction became final.

When the Supreme Court announces a decision on a constitutional rule of criminal procedure, the first issue that must be addressed is whether the rule announced should be applied retroactively to convictions that became final prior to the date of the decision. Resolution of this question, to a large extent, depends on whether the rule announced is characterized as a "new" rule or an "old" rule. This task is by no means an easy one. "It is admittedly often difficult to determine when a case announces a new rule, and we do not attempt to define the spectrum of what may or may not constitute a new rule for retroactivity purposes." *Teague v. Lane*, 489 U.S. 288, 301, 109 S.Ct. 1060, 1070, 103 L.Ed.2d 334 (1989) (plurality opinion, O'Connor, J.).

■ A Supreme Court decision that merely applies a " 'well-established constitutional principle' " to a new set of circumstances always is applied retroactively on collateral review. *Yates v. Aiken*, 484 U.S. 211, 216, 108 S.Ct. 534, 537–38, 98 L.Ed.2d 546 (1988) (quoting *Desist v. United States*, 394 U.S. 244, 263–64, 89 S.Ct. 1030, 1041–42, 22 L.Ed.2d 248 (1969) (Harlan, J., dissenting)). This principle of law is founded on the belief that collateral attacks "should be resolved by reference to the state of the law at the time of the petitioner's conviction." *Id.* As Justice Harlan eloquently explained:

> The theory that the habeas petitioner is entitled to the law prevailing at the time of his conviction is, however, one which is more complex than the Court has seemingly recognized. First, it is necessary to determine whether a particular decision has really announced a "new" rule at all or whether it has simply applied a well-established constitutional principle to govern a case which is closely analogous to those which have been previously considered in the prior case law.... One need not be a rigid partisan of Blackstone to recognize that many, though not all, of this Court's constitutional decisions are grounded upon fundamental principles whose content does not change dramatically from year to year, but whose meanings are altered slowly and subtly as generation succeeds generation. In such a context it appears very difficult to argue against the application of the "new" rule in all habeas cases since one could never say with any assurance that this Court would have ruled differently at the time the petitioner's conviction became final.

*Desist*, 394 U.S. at 263–64, 89 S.Ct. at 1041–42 (dissenting opinion). Thus, should we conclude that the *Cruz* Court, in rejecting an interlocking confession exception to the *Bruton* rule, merely applied a well established constitutional principle, there is no doubt that we must apply that rule on collateral review of Graham's conviction.

Alternatively, of course, it may be that *Cruz* announced a "new" constitutional rule of criminal procedure. "[A] case announces a new rule when it breaks new ground or imposes a new obligation on the States or the Federal Government." *Teague*, 489 U.S. at 301, 109 S.Ct. at 1070 (plurality opinion). Put differently, and perhaps more meaningfully, "a case announces a new rule if the result was not *dictated* by precedent existing at the time the defendant's conviction became final." *Id.* Having set out the test for determining what constitutes a new rule, Justice

O'Connor next directed her attention to the issue of when retroactive application of a new rule is appropriate.

█ Adopting Justice Harlan's view of retroactivity, Justice O'Connor emphasized the importance of finality in the context of criminal convictions. "Application of constitutional rules not in existence at the time a conviction became final seriously undermines the principle of finality which is essential to the operation of our criminal justice system. Without finality, the criminal law is deprived of much of its deterrent effect." *Id.* at 309, 109 S.Ct. at 1074. Given the importance of finality, Justice O'Connor held that in general "new" rules should not be applied retroactively to cases on collateral review. *Id.* at 310, 109 S.Ct. at 1075. "Unless they fall within an exception to the general rule, new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced." *Id.*

Expanding on principles initially advanced by Justice Harlan, Justice O'Connor recognized two exceptions to the "general rule" against retroactive application. First, "a new rule should be applied retroactively if it places 'certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe.'" *Id.* at 311, 109 S.Ct. at 1075 (quoting *Mackey v. United States,* 401 U.S. 667, 692, 91 S.Ct. 1160, 1180, 28 L.Ed.2d 404 (1971) (Harlan, J., concurring in part and dissenting in part)). We believe that this first exception is unlikely to be satisfied in the majority of cases and it clearly is inapplicable in the instant case. Second, retroactive application is warranted if the new rule "requires the observance of 'those procedures that ... are "implicit in the concept of ordered liberty." ' " *Id.* (quoting *Mackey,* 401 U.S. at 693, 91 S.Ct. at 1180 (quoting *Palko v. Connecticut,* 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937))). Justice O'Connor added her own gloss to this second exception, emphasizing that it is "to be reserved for watershed rules of criminal procedure," *id.* at 311, 109 S.Ct. at 1075, that impact on the "accuracy" of criminal proceedings and "implicate the fundamental fairness of the trial." *Id.* at 312, 109 S.Ct. at 1076.

In the case before us we find it unnecessary to categorize the *Cruz* rule as either a "new" or "old" rule of constitutional criminal procedure. Rather, we, like the district court, believe that regardless of whether the *Cruz* rule is characterized as a "new" or "old" rule it should be applied retroactively. As we explain below, either interpretation of the *Cruz* rule is completely plausible.

Certain statements made by the majority in *Cruz* indicate that the Court did not perceive itself to be announcing a "new" constitutional rule of criminal procedure. While these statements alone are not dispositive, they do shed some light on how the Supreme Court viewed its own decision. At the outset of its opinion, the Court emphasized that it was resolving the issue that the *Parker* Court had been "unable authoritatively to resolve." *Cruz,* 481 U.S. at 188, 107 S.Ct. at 1716. Thus the Court acknowledged that a clear holding did not emerge from the splintered decision in *Parker* and suggested that the *Bruton* rule remained intact. Additionally, the *Cruz* Court on two occasions deemed it necessary to assert that it merely was abiding by the principles initially established in *Bruton. See id.* at 193, 107 S.Ct. at 1719 ("Having decided *Bruton,* we must face the honest consequences of what it holds."); *id.* ("[O]ur holding here does no more than reaffirm [*Bruton's*] central proposition. This case is indistinguishable from *Bruton* with respect to those factors the Court has deemed relevant in this area."). Thus, *Cruz* can be viewed simply as another step in the gradual evolution of the law concerning a fundamental legal principle—an accused's right of confrontation. As Justice Harlan himself recognized, venerable constitutional principles often are refined and clarified over time. *See Desist,* 394 U.S. at 263–64, 89 S.Ct. at 1041–42. This process of development necessarily takes place on a case-by-case basis and, while the facts of each case may be different, the governing constitutional principle often will be the same. *Id.* In *Cruz,*

the Court apparently perceived itself to be implementing the constitutional principle originally recognized in *Bruton*. As such, the rule announced in *Cruz* can be viewed merely as a natural outgrowth of *Bruton* and, therefore, as an "old" rule subject to retroactive application. *See Yates*, 484 U.S. at 216 n. 3, 108 S.Ct. at 538 n. 3.

Having said that, we acknowledge that labeling the *Cruz* rule an "old" rule may not adequately take into account the generally perceived break from *Parker* that *Cruz* represented. Indeed, certain compelling factors militate in favor of treating the *Cruz* Court's decision as a "new" rule. In particular, the result that the Court reached in *Cruz* plainly "was not *dictated* by precedent existing at the time [Graham's] conviction became final." *Teague*, 489 U.S. at 301, 109 S.Ct. at 1070 (plurality opinion). While the *Cruz* majority stated that it merely was reaffirming the central proposition of *Bruton*, *Cruz*, 481 U.S. at 193, 107 S.Ct. at 1719, the majority directly repudiated the interlocking confession exception to the *Bruton* rule that the *Parker* plurality and several Courts of Appeals, including our own, previously had recognized. *Id.* at 191, 107 S.Ct. at 1718. Moreover, "the fact that a court says that its decision is within the 'logical compass' of an earlier decision, or indeed that it is 'controlled' by a prior decision, is not conclusive for purposes of deciding whether the current decision is a 'new rule' under *Teague*." *Butler v. McKellar*, 494 U.S. 407, 110 S.Ct. 1212, 1217, 108 L.Ed.2d 347 (1990). Finally, *Parker* commonly was perceived as having endorsed an interlocking confession exception to the *Bruton* rule. The Supreme Court's silence on this issue for a period of eight years following the decision in *Parker* serves only to lend further support to such an interpretation of the decision. Thus, in a very real sense, *Cruz*, by repudiating the *Parker* plurality's exception to the *Bruton* rule, significantly altered the legal landscape and could be viewed as having announced a "new" rule.

Assuming that *Cruz* announced a "new" rule, the question then becomes whether it should be applied retroactively. In *Teague*,

Justice O'Connor set out two exceptions to the general rule against retroactive application of new rules on collateral review. 489 U.S. at 311, 109 S.Ct. at 1075. As we previously noted, the first exception does not apply in the instant case. The second exception is triggered when application of a new rule would lead one to question the accuracy of a conviction and the fundamental fairness of a proceeding. *Id.* at 312–13, 109 S.Ct. at 1076–77. "A rule that qualifies under this exception must not only improve accuracy, but also 'alter our understanding of the *bedrock procedural elements*' essential to the fairness of a proceeding." *Sawyer v. Smith*, — U.S. —, 110 S.Ct. 2822, 2831, 111 L.Ed.2d 193 (1990) (citing *Teague*, 489 U.S. at 311, 109 S.Ct. at 1075 (quoting *Mackey*, 401 U.S. at 693, 91 S.Ct. at 1180 (Harlan, J., concurring in part and dissenting in part))).

We believe that the rule announced in *Cruz* falls within this second exception. *Cruz* recognized the risk of inaccurate results stemming from the admission of a nontestifying codefendant's confession even if that confession interlocks with that of the defendant. 481 U.S. at 192–93, 107 S.Ct. at 1718–19. This emphasis on accuracy provided the underpinnings for the Court's decision in *Bruton* as well. *See Bruton*, 391 U.S. at 136, 88 S.Ct. at 1628 (noting the inherent unreliability of accomplice testimony particularly where there is no opportunity to cross-examine). While we concede that concerns for accuracy may be less when the defendant as well as the codefendant have independently confessed, the same risks of unreliability inhere when there is no opportunity for cross-examination. Thus, the concern for accuracy was one of the primary considerations that led the *Cruz* Court to conclude that the admission of a nontestifying codefendant's confession, even if it interlocks with a confession of the defendant, violates the very principles incorporated in the Confrontation Clause of the Sixth Amendment. 481 U.S. at 193, 107 S.Ct. at 1719.

Additionally, again assuming *Cruz* announced a "new" rule, there can be little doubt that the decision altered our understanding of a bedrock procedural principle

aimed at ensuring a fair proceeding. *Cruz's* central message is that a nontestifying codefendant's confession generally is not admissible against another defendant. This is in sharp contrast to the *Parker* plurality's holding that if the two defendants' confessions interlock they both can be admitted. The "bedrock procedural element" implicated in *Cruz* was the right of confrontation; a right which the Supreme Court long ago referred to as being "[o]ne of the fundamental guarantees of life and liberty." *Kirby v. United States*, 174 U.S. 47, 55, 19 S.Ct. 574, 577, 43 L.Ed. 890 (1899); *see also Chambers v. Mississippi*, 410 U.S. 284, 295, 93 S.Ct. 1038, 1045–46, 35 L.Ed.2d 297 (1973) ("The right of cross-examination is more than a desirable rule of trial procedure. It is implicit in the constitutional right of confrontation."); *Pointer v. Texas*, 380 U.S. 400, 405, 85 S.Ct. 1065, 1068–69, 13 L.Ed.2d 923 (1965) (The right of "cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal."). While the right to confront and to cross-examine one's accusers is not absolute, *Maryland v. Craig*, ——— U.S. ———, 110 S.Ct. 3157, 3163, 111 L.Ed.2d 666 (1990), and various exceptions to this right have been carved out through the years, *Pointer*, 380 U.S. at 407, 85 S.Ct. at 1069–70, the competing interests and public policy concerns that have led to these exceptions have been narrowly cabined. *Chambers*, 410 U.S. at 295, 93 S.Ct. at 1045–46 ("Of course, the right to confront and to cross-examine is not absolute and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process."). Thus, the constitutionally prescribed "preference" for direct confrontation and cross-examination, *Ohio v. Roberts*, 448 U.S. 56, 63, 100 S.Ct. 2531, 2537, 65 L.Ed.2d 597 (1980), can be dispensed with "only where denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured." *Craig*, ——— U.S. at ———, 110 S.Ct. at 3166 (citations omitted). *Cruz* unequivocally recognizes this principle and, since it repudiated the *Parker* plurality's interpre-

tation of the right of confrontation, it altered our understanding of a "bedrock procedural element."

The *Cruz* rule, therefore, satisfies Justice O'Connor's second exception to the general rule against retroactive application of "new" constitutional rules of criminal procedure. Perhaps the most persuasive case for retroactive application of *Cruz* was made by the Supreme Court itself when it was faced with the issue of whether *Bruton* should be applied retroactively. After considering the factors that would counsel against retroactive application, including the impact on the administration of justice, the Court declared: "[E]ven if the impact of retroactivity may be significant, the constitutional error presents a serious risk that the issue of guilt or innocence may not have been reliably determined." *Roberts v. Russell*, 392 U.S. 293, 295, 88 S.Ct. 1921, 1922, 20 L.Ed.2d 1100 (1968) (per curiam).

Accordingly, under either characterization—"old" or "new"—the *Cruz* rule applies to convictions on collateral review.

### C. *Harmless Error*

Having concluded that retroactive application of the *Cruz* rule is warranted, we must now evaluate whether, given the admission of Stephens' statement at Graham's trial, the district court properly granted Graham's habeas petition. The admission of a nontestifying codefendant's confession, while clearly error, may, like many other trial errors, be harmless beyond a reasonable doubt. *See generally Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). In applying the *Chapman* test, our task is to determine whether, based on the entire record, it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Id.* "To say that an error did not contribute to the verdict is ... to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." *Yates v. Evatt*, ——— U.S. ———, 111 S.Ct. 1884, 1893, 114 L.Ed.2d 432 (1991). As the Court recently

explained: "[T]he harmless-error doctrine is essential to preserve the 'principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence, and promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error.'" *Arizona v. Fulminante,* ── U.S. ──, 111 S.Ct. 1246, 1264, 113 L.Ed.2d 302 (1991) (harmless error analysis applies to the admission of coerced confessions) (quoting *Delaware v. Van Arsdall,* 475 U.S. 673, 681, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986)).

■ Violations of the *Cruz* rule are subject to harmless error analysis. *Cruz,* 481 U.S. at 193–94, 107 S.Ct. at 1719–20; *see also Brown v. United States,* 411 U.S. 223, 231–32, 93 S.Ct. 1565, 1570–71, 36 L.Ed.2d 208 (1973) ("We reject the notion that a *Bruton* error can never be harmless. '[A] defendant is entitled to a fair trial but not a perfect one,' for there are no perfect trials.") (quoting *Lutwak v. United States,* 344 U.S. 604, 619, 73 S.Ct. 481, 490, 97 L.Ed. 593 (1953)); *Harrington v. California,* 395 U.S. 250, 254, 89 S.Ct. 1726, 1728, 23 L.Ed.2d 284 (1969) (*Bruton* error may be harmless where other evidence of guilt is overwhelming). As the Supreme Court explained in the context of a *Bruton* violation:

> The mere finding of a violation of the *Bruton* rule in the course of the trial, however, does not automatically require reversal of the ensuing criminal conviction. In some cases the properly admitted evidence of guilt is so overwhelming, and the prejudicial effect of the codefendant's admission is so insignificant by comparison, that it is clear beyond a reasonable doubt that the improper use of the admission was harmless error.

*Schneble v. Florida,* 405 U.S. 427, 430, 92 S.Ct. 1056, 1059, 31 L.Ed.2d 340 (1972). In making this evaluation, we are free to consider the content and nature of the defendant's, in this case Graham's, own confession. *Cruz,* 481 U.S. at 193–94, 107 S.Ct. at 1719–20.

■ Based on our review of the entire record, we are convinced that the district court erred in concluding that the erroneous admission of Stephen's confession was not harmless error. Two factors lead us to this result.

First, Graham confessed at least three times, construed liberally four times, to having fired the fatal shots. Detective Molloy testified that while transporting Graham to the Precinct for questioning he mumbled that he had shot Sanders and stated "I knew this was going to happen." Upon his arrival at the Precinct and after having been given the *Miranda* warnings, Graham first orally and then in writing related what had transpired on the morning of December 19, 1981 and again admitted to having fired the fatal shots. Finally, Graham agreed to give a videotaped statement concerning the Utica Avenue station shooting. Prior to asking any questions, Assistant District Attorney Graves once again advised Graham of his constitutional rights. She emphasized that he was free to refuse to answer any and all questions put to him and to stop the interview at any time. Graham acknowledged that he understood his rights and voluntarily waived them.

Subsequent to hearing oral argument in this case, we requested that the District Attorney provide us with a copy of the videotaped statements that were before the jury. We have since obtained a copy of the videotape and have reviewed it. While Graham's counsel attempted to call into question the voluntariness of Graham's confession, the jury, having seen the videotape, was able to evaluate for itself the legitimacy of that argument. We too have examined carefully the videotaped statement given by Graham and have been unable to discern any indication that the confession was involuntarily given or in any way the product of improper police tactics. Indeed, we were struck by the casual and matter of fact manner in which Graham methodically recounted the events that transpired on the morning of the shooting. Without the least bit of hesitation, Graham stated that he was approached by Green and agreed to participate in a plan to rob

Sanders of his rings and money. He admitted to carrying a loaded .32 caliber pistol and to having fired three errant shots at Sanders prior to entering the Utica Avenue station. Finally, Graham admitted to having fired the shots that killed Sanders and to having disposed of the shells first and later the gun.

Throughout his statement, Graham was lucid and demonstrated an awareness and understanding of his rights and the questions being asked. On a few occasions, Graham chose not to identify from whom he had obtained the gun. And when shown two rings that had been found on Green, Graham identified one as having been worn by Sanders on the night of the shooting and the other as belonging to Green.

Second, Watson, the token booth attendant, identified Graham at trial as being the individual that fired the fatal shots. Defense counsel challenged the accuracy of that identification by confronting Watson with a prior statement that had been given to investigating officials immediately following the shooting. In that statement, Watson was noted as having first identified the shooter as the taller of the two men. He later stated that it was the shorter of the two men who fired the shots (Graham was taller than Stephens). Watson's statements were made prior to his having the opportunity to see the suspects in a lineup. At the lineup and at trial, Watson unequivocally identified Graham as the shooter. Moreover, defense counsel's challenge to the identification was nothing more than a few questions on cross-examination and re-cross-examination. The accuracy of Watson's testimony was not directly attacked in any other way.

Given the comprehensive nature of his videotaped statement and the fact that Graham had admitted his participation in the shooting on two other occasions, coupled with the eyewitness identification and the testimony of the investigating officers, we fail to see how the inclusion of Stephens' confession, which also identified Graham as the shooter, contributed to the jury's verdict. "To say that an error did not 'contribute' to the ensuing verdict is not, of course,

to say that the jury was totally unaware of that feature of the trial later held to have been erroneous." *Yates,* —— U.S. at ——, 111 S.Ct. at 1893. Plainly the jury was aware of the content of Stephens' confession; Stephens himself was on trial and convicted of the same charges as Graham. Notwithstanding this fact, the independent evidence of Graham's guilt admitted at trial, most prominently his own videotaped confession, was overwhelming. *See Schneble,* 405 U.S. at 431, 92 S.Ct. at 1059. Moreover, the jury had before it the eyewitness testimony of Watson and that testimony was substantially corroborated, save for the identifications themselves, by the testimony of Ford, the civilian bystander.

In granting the habeas petition, the district court expressed concern over the jury's request to examine the written statements of both Graham and Stephens followed by a guilty verdict within an hour after receiving the statements. From this series of events, the district court inferred that Stephens' confession played a determinative role in Graham's conviction. While this is one possible interpretation of the events, it is nothing more than mere conjecture and begs the ultimate question—was the admission of a nontestifying codefendant's confession harmless? Here, it must not be forgotten that both Graham and Stephens were being prosecuted for robbery and murder. It, therefore, is not surprising that the jury sought to consider the written confessions given by both defendants. Graham's confession alone taken in combination with the other independent evidence of his guilt was so overwhelming that we conclude that "the 'minds of an average jury' would not have found the State's case significantly less persuasive" had Stephens' confession been excluded. *Schneble,* 405 U.S. at 432, 92 S.Ct. at 1060 (quoting *Harrington,* 395 U.S. at 254, 89 S.Ct. at 1728); *see also Tamilio v. Fogg,* 713 F.2d 18, 21 (2d Cir.1983), *cert. denied,* 464 U.S. 1041, 104 S.Ct. 706, 79 L.Ed.2d 170 (1984). As the *Schneble* Court emphasized:

> Judicious application of the harmless-error rule does not require that we indulge assumptions of irrational jury behavior when a perfectly rational explanation for

the jury's verdict, completely consistent with the judge's instructions, stares us in the face.

405 U.S. at 431–32, 92 S.Ct. at 1059–60 (citations omitted). Here, we have no doubt that the admission of the confession of Graham's codefendant, in light of the weight of the other evidence, including Graham's own confession, was harmless beyond a reasonable doubt.

## CONCLUSION

The rule announced in *Cruz* is entitled to retroactive application. However, in this case the error resulting from the admission of the codefendant's confession was harmless beyond a reasonable doubt. Accordingly, the judgment of the district court is reversed and the matter is remanded to the district court with directions to dismiss the petition.

## ON PETITION FOR REHEARING

This matter is before us on Melvin Graham's petition for rehearing or rehearing *in banc.* Graham contends that in rendering our October 3, 1991 decision reversing the district court's judgment granting a petition for a writ of habeas corpus we improperly considered a videotape of Graham's confession. *See* Page 983. The videotaped confession had been introduced at Graham's New York state trial and was shown to the jury that convicted him. Graham maintains that we improperly obtained the videotape and that we should not have considered it in making our decision.

The existence of the videotaped confession was called to our attention during oral argument in this case; at no time was it suggested that consideration of the contents of that videotape would be improper. Indeed, the brief filed by the state also emphasized the existence of three confessions by Graham and particularly made reference to the existence of the videotaped confession. *See* Br. for Appellant at 8, n. 7. Despite these repeated references to the videotape, Graham's counsel never challenged the propriety of considering the videotape on appeal. Moreover, our review of the state court trial record, which was made a part of the record on appeal, clearly

indicated that a videotaped confession was taken and admitted at the trial. After hearing oral argument, we learned that, while the videotape was referred to in the state court trial record, the videotape itself had not been made part of the record on appeal. We, therefore, in accordance with Fed.R.App.P. 10(e) contacted the Clerk's Office and requested that the videotape be made a part of the record on appeal. The usual procedure would call for the Clerk's Office to notify all parties of our request. Unfortunately, it appears that Graham's counsel was not so notified. This inadvertent error, however, is not a basis for withdrawing our opinion or changing our decision.

The ultimate question on appeal was whether the erroneous introduction of a codefendant's interlocking confession was harmless error. The district court in a brief opinion acknowledged the existence of at least two confessions by Graham and concluded that the admission of his codefendant's confession was not harmless. In reviewing that determination, we reviewed the entire record in the state trial proceeding, including the videotaped confession, to determine whether the erroneously admitted evidence was central to the jury's verdict. The jury viewed the videotape and we, in the interests of justice, sought to evaluate all the evidence that was before the jury.

In sum, while it appears that the technical procedures for modifying the record on appeal may not have been complied with, we can discern no basis for disturbing our judgment.

The petition for rehearing is denied.

/s/Thomas J. Meskill
Thomas J. Meskill, U.S.C.J.
/s/Amalya L. Kearse
Amalya L. Kearse, U.S.C.J.
/s/Joseph M. McLaughlin
Joseph M. McLaughlin, U.S.C.J.