85 N.Y.2d 265 (1995)
648 N.E.2d 459
624 N.Y.S.2d 83
The People of the State of New York, Respondent,
v.
Cecilio Eastman, Appellant.
Court of Appeals of the State of New York.
Argued January 4, 1995
Decided February 21, 1995.
Toko Serita and Philip L. Weinstein, New York City, for appellant.
Charles J. Hynes, District Attorney of Kings County, Brooklyn (Shulamit Rosenblum, Roseann B. MacKechnie and Monique Ferrell of counsel), for respondent.
Chief Judge KAYE and Judges SIMONS, TITONE, SMITH and LEVINE concur with Judge CIPARICK; Judge BELLACOSA dissents and votes to affirm in a separate opinion.
*268 CIPARICK, J.
On this appeal, defendant collaterally attacks his conviction contending that it was obtained in violation of his Sixth Amendment right of confrontation as delineated in Cruz v New York (481 US 186) issued by the Supreme Court after his conviction became final. In Cruz, the Supreme Court held that the Confrontation Clause bars the introduction of a confession of a nontestifying codefendant, not directly admissible against the defendant, that inculpates the defendant. The issues before us are whether Cruz should be accorded retroactive effect and, if so, whether the admission of the codefendant's redacted confession was harmless error. We now decide that Cruz should be applied retroactively, and, as applied to this case, the introduction of the nontestifying codefendant's confession is not harmless error.

I.
Between midnight and 12:30 A.M. on April 1, 1981, Wilfred Barrett, a Con Edison security guard, was fatally shot in an attempted robbery. During the scuffle, Barrett fired his gun. When a police officer arrived at the crime scene, Barrett, who was lying on the ground, told the police officer that he may have shot one of his three or four assailants. When the police officer removed the revolver from Barrett's hand, he observed that one shell was missing from the chamber. Before Barrett *269 was transported to a nearby hospital, he identified a suspect the police brought to the scene, who later proved not to be involved in the incident. Barrett subsequently died of his wounds at the hospital.
When the detective assigned to this case arrived at the hospital, he was informed by a fellow officer that Barrett had already been taken to the operating room, and that a Mr. Eastman was in the emergency room with a gunshot wound which he claimed he sustained at the same location where Barrett was fatally shot. When the detective questioned Eastman about where he was shot, Eastman identified the same location where Barrett was found. Eastman was subsequently removed for surgery, during which a bullet was recovered. This bullet was later identified as the bullet discharged from Barrett's gun.
Thereafter, the detective observed Carlos Croney, Carlos Richards and Rubin Charles waiting near the emergency room, individuals whom the detective believed had information about the shooting incident. The detective consequently directed his fellow officers to transport these individuals to the precinct for questioning.
The detective learned that at least two of these individuals, Croney and Richards, were in the car that fled the crime scene with the wounded defendant, and that the gun used to shoot Barrett was dropped off at Charles's apartment, where the detective later recovered it. The detective then proceeded to question Croney after he waived his rights. During the course of questioning, Croney gave a statement that provides, as relevant:
"[Eastman] told me to stop the car * * * and wait. [Eastman] got out the car with [Richards]. * * * I heard more than one shot. [Richards] and [Eastman] came running back. [Eastman] told me he was shot. When they got out of the car, they had told me stop we see something. Either [Richards] or [Eastman] said we going to take the man off. When they came back [Richards] said the man shot [Eastman]. I took them to the hospital and drove off. The black gun was on the front seat of the car."
Later that day, the detective returned to the hospital to speak with Eastman. After obtaining permission from hospital administrators to speak with Eastman, the detective advised *270 him of his rights, which he waived. The detective then proceeded to question him about the Barrett shooting and his gunshot wound. In his trial testimony, the detective indicated that Eastman was in the recovery room during this questioning, that he was speaking in a low voice, and that he was laced with IV tubes. Eastman recounted that earlier that day he was in the car with Croney, who was driving, that Croney dropped him off, he heard a shot and that he sustained a gunshot wound. Eastman claimed three unknown individuals came to his aid and transported him to the hospital. The questioning then concluded.
Several hours later, Eastman told the police officer guarding him in the hospital that he wanted to speak with the detective again. Subsequently, the detective, accompanied by an Assistant District Attorney and a stenographer, returned to the hospital, where they requested and received permission to speak to Eastman. Eastman was still encumbered by numerous IV tubes. The Assistant District Attorney advised Eastman of his rights, which he again waived, and a question and answer session ensued, which was recorded by the stenographer.
During this questioning, Eastman indicated that he was in a car with Croney and Richards, and that at about 12:15 A.M., Richards said "Let's go check out that old man over there." Eastman related that Richards wanted to take the envelope the man was holding. Thereafter, he and Richards got out of the car, Richards ran up to the man and Eastman observed Richards try to grab the envelope from the man. Eastman claimed that as he was approaching this scuffle, he heard a shot, and turned around to run away. While he was running, he "started feeling beat" and realized he had been shot. Eastman stated that Richards said he got hit, that Richards "shot once," and then he and Richards returned to the car where Croney was waiting. Eastman told Croney that he had been shot and asked Croney to take him to the hospital. In response to the Assistant District Attorney's questions, defendant denied that he had a gun, that he asked anyone to "do a job with him and Croney," or that he saw Croney with a gun. At the conclusion of the questioning, the Assistant District Attorney authorized Eastman's arrest.
By an indictment dated April 10, 1981, Eastman and Croney were jointly charged with murder in the second degree and *271 criminal possession of a weapon in the second degree[1] under the theory that they were "aiding the other and acting in concert with another person" in an attempt to commit a robbery, and in furtherance of such crime fatally shot Wilfred Barrett.
Prior to trial, defendant moved, inter alia, to sever his case from codefendant Croney's on the ground that his Sixth Amendment right of confrontation would be violated by the introduction of Croney's inculpatory statement against him at trial. Defendant argued that severance was required under Bruton v United States (391 US 123)[2] since the codefendant would not testify and his statement and the codefendant's were antagonistic. Defendant asserted that his statement was consistent with his defense that Richards committed the crime while he merely exited the car to see what was happening with Richards. Defendant maintained that he was not acting in concert with anyone. The trial court denied severance but ordered redaction of the codefendant's statement. The trial court directed deletion of the specific reference indicating who ordered the car to stop before the shooting, and ruled that the codefendant's statement that he saw defendant carry the gun back to the codefendant's car after the shooting incident and place it on the front seat be omitted.
At trial, the People presented as witnesses, inter alia, the investigating police officers, the detective who questioned the defendants, the Assistant District Attorney who authorized defendant's arrest, and two doctors and a nurse who were involved in the operation to remove the bullet from defendant's abdomen.
The detective testified that the codefendant related that "somebody" in the vehicle directed him to stop the car because "they wanted to take off the old man." The detective also testified that the codefendant reported that Richards and Eastman exited the vehicle together and came running back together after Eastman was shot. Finally, the detective stated that the codefendant claimed he drove Eastman and Richards to the hospital, dropped them off there, and then took the gun *272 they left in the car to Charles's apartment. At defense counsel's request, the trial court issued a limiting instruction, which was again repeated as part of the charge to the jury, advising that this "statement is only admitted as evidence to be considered [in] the case against the defendant Croney."
With respect to defendant, the detective testified about the substance of the conversations he held with defendant at the hospital. Similar testimony regarding the question and answer session at the hospital was also provided by the Assistant District Attorney.
On his direct examination, defendant disavowed any involvement in the attempt to rob Barrett. Defendant expressly denied that he planned or assisted in a plan to rob Barrett, denied that he directed anyone to rob Barrett,[3] denied that he intended to share in the fruits of a robbery of Barrett and that he or anyone else in the car that night had a gun. Defendant claimed that he did not recall having any conversation with the detective or an Assistant District Attorney, with a stenographer present, after his operation to remove the bullet. Defendant testified that Richards directed the codefendant to stop the car, that Richards got out of the car by himself, and that he only proceeded after Richards when the codefendant told him to see what Richards was doing. Defendant claimed that after he exited the car, he turned the corner, heard a shot and immediately ran back to the car. Defendant stated he then felt a burning sensation in his stomach. When he reached the car, he told the codefendant he had been shot. Defendant related that Richards was not in the car at this time, and did not accompany them to the hospital.
Included in the Trial Judge's jury charge was an instruction on the acting in concert theory charged in the indictment. The Trial Judge explained that if the jury finds
"that the People have proven by evidence beyond a reasonable doubt that the defendants Croney and Eastman were accomplices in the commission of the attempted robbery, then, under the law, they are criminally liable for all the acts and conduct of all the participants during the robbery as though they fired the shot which resulted in the death of Wilfred Barrett."
*273 The jury found defendant and the codefendant guilty as charged by the indictment, and the trial court entered a judgment convicting them of murder in the second degree and criminal possession of a weapon in the second degree. Defendant appealed, arguing that the trial court improperly denied the motion to sever his case from that of his codefendant on Bruton grounds, as well as his motion to suppress certain statements following the Huntley hearing. The Appellate Division affirmed the judgment (see, People v Eastman, 114 AD2d 509), and this Court denied defendant's application for leave (see, People v Eastman, 67 N.Y.2d 651).
Thereafter, defendant moved pursuant to CPL 440.10 to vacate his judgment of conviction on the ground that it constituted a violation of Federal constitutional law under the Supreme Court's recent decision in Cruz v New York (481 US 186, supra [1987]). Defendant maintained that Cruz should be applied retroactively, and, when applied to this case, mandates reversal because the introduction of the redacted confession of the nontestifying codefendant against him at trial abridged the Sixth Amendment's Confrontation Clause. Supreme Court denied the motion by order entered February 7, 1991. The Appellate Division affirmed, declining to address the retroactivity of Cruz in light of their finding that the admission of the codefendant's statement was harmless error (see, People v Eastman, 195 AD2d 572). The Appellate Division held that the codefendant's statement was not admitted as evidence against defendant, the defendant's own inculpatory statement was comprehensive and satisfactorily explained his part in the crimes charged; and, defendant did not affirmatively repudiate his inculpatory statements (see, id., at 573). Therefore, the Appellate Division concluded that there was no reasonable possibility that the admission of the codefendant's statement affected the verdict against defendant (see, id., at 573). A Judge of this Court granted leave, and we reverse.

II.
In Cruz, the Supreme Court rejected the limited exception recognized in the wake of Bruton v United States (391 US 123, supra) that when both the defendant and codefendant confessed to the crime charged and the confessions were factually *274 consistent or "interlocked",[4] no violation of defendant's right of confrontation resulted from the introduction of the interlocking confession because the codefendant's statement purportedly would not have a "devastating effect" on a defendant who already confessed to essentially the same facts (see, e.g., People v Cruz, 66 N.Y.2d 61, 69-72, revd 481 US 186, supra). In Cruz, the Supreme Court identified that what the "interlocking" nature of the codefendant's confession pertains to is "not its harmfulness but rather its reliability" (Cruz v New York, 481 US, at 192, supra [emphasis in original]). The Supreme Court distinguished the prejudice that inures to a defendant from a codefendant's inculpatory confession from the reliability of the codefendant's statement as evidence. "Its reliability * * * may be relevant to whether the confession should (despite the lack of opportunity for cross-examination) be admitted as evidence against the defendant * * * but cannot conceivably be relevant to whether, assuming it cannot be admitted, the jury is likely to obey the instruction to disregard it, or the jury's failure to obey is likely to be inconsequential" (Cruz v New York, 481 US, at 192-193, supra [emphasis in original]). The Supreme Court concluded that "the law cannot command respect if such an inexplicable exception to a supposed constitutional imperative is adopted" (id.).
Because a codefendant's credibility is inevitably suspect based on the recognized motivation to shift blame to an accomplice, the unreliability of a codefendant's confession is intolerably compounded when, as here, the alleged accomplice does not testify and cannot be tested by cross-examination (Bruton v United States, 391 US, at 136, supra). This is precisely the type of threat to the accuracy and fairness of a fair trial that the Confrontation Clause was designed to prevent (see, id.).
As the fundamental right embodied in the Confrontation Clause is the right to cross-examine one's adverse witness, it is nothing short of a denial of due process to rely on a jury's presumed ability to disregard a codefendant's confession implicating another defendant when the jury is determining the latter defendant's guilt or innocence (see, Cruz v New York, 481 US, at 192-193, supra; Bruton v United States, 391 US, at 136, supra; see also, Jackson v Denno, 378 US 368). In this regard, the Supreme Court's holding in Cruz marks a break *275 from both Federal and State law precedents. Because Cruz fundamentally alters the Federal constitutional landscape, the principles of retroactivity developed by the Supreme Court in construing Federal constitutional law govern the disposition of this case.
The threshold issue in determining whether to apply a constitutional rule retroactively is characterization of the rule as "new" or "old." It is settled that when a Supreme Court decision applies a well-established constitutional principle to a new circumstance, it is considered to be an application of an "old" rule, and is always retroactive (see, Yates v Aiken, 484 US 211, 216; Graham v Hoke, 946 F.2d 982, 991, cert denied 502 US 1039, mot to vacate conviction denied 140 Misc 2d 417, affd 158 AD2d 714, lv denied 76 N.Y.2d 735). This retrospective application reflects the development and refinement of constitutional principles over time. Concern for finality in criminal proceedings, however, dictates that "new" rules generally not be applied retroactively to cases on appeal (see, Mackey v United States, 401 US 667, 681-683 [Harlan, J., concurring in part, dissenting in part]; accord, People v Pepper, 53 N.Y.2d 213, 219-221, cert denied 454 US 967). In Teague v Lane (489 US 288, 310, reh denied 490 US 1031), the Supreme Court reaffirmed this precept, and embraced Justice Harlan's approach to retroactivity for cases on collateral review, which recognizes that "[u]nless they fall within an exception to the general rule, new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced" (see also, Mackey v United States, 401 US, at 675, supra [Harlan, J., concurring in part, dissenting in part]; Desist v United States, 394 US 244, 256-257 [Harlan, J., dissenting]).
Pursuant to Teague, new rules of constitutional criminal procedure are applied retrospectively in one of two situations: (1) where the new rule places "certain kinds of primary, private individual conduct beyond the power of the criminal law making authority to proscribe" or (2) where the new rule alters a bedrock procedural element of criminal procedure which implicates the fundamental fairness and accuracy of the trial (see, Teague v Lane, 489 US, at 311-312, supra, citing Mackey v United States, 401 US, at 692, supra; cf., People v Pepper, 53 NY2d, at 220-221, supra). "[A] case announces a new rule when it breaks new ground or imposes a new obligation on the States or the Federal Government; [or,] [t]o put it differently, a case announces a new rule if the result *276 was not dictated by precedent existing at the time the defendant's conviction became final" (Teague v Lane, 489 US, at 301, supra). Cruz unquestionably departs from established precedent, and implicates a bedrock procedural element  the Sixth Amendment right of confrontation (see, e.g., People v McNeil, 24 N.Y.2d 550; People v Galloway, 24 N.Y.2d 935; People v Cruz, 66 N.Y.2d 61, supra; Parker v Randolph, 442 US 62; Bruton v United States, 391 US 123, supra).
Cruz declares that when the incriminating confession of a nontestifying codefendant is admitted against the defendant, the procedural apparatus of trial never assured the defendant a fair determination of guilt or innocence, regardless of whether the Trial Judge issued a limiting instruction that the confession not be considered against the defendant, or the defendant's own confession was admitted as evidence against him (Cruz v New York, 481 US, at 193-194, supra; see also, Griffith v Kentucky, 479 US 314). As the rule announced in Cruz is central to an accurate determination of guilt or innocence, the Supreme Court determined that the admission of the codefendant's inculpatory confession against the defendant undermined the fundamental fairness of the trial, where, as here, there was no opportunity for cross-examination to test the reliability of the codefendant's confession (see, Graham v Hoke, 946 F2d, at 993, supra). Therefore, we conclude that retroactive application of Cruz is constitutionally commanded on collateral review of a conviction.

III.
Having determined that Cruz must be applied retroactively to this case, we now consider whether the admission of codefendant Croney's statement constituted harmless error in this case.
An alleged violation of the Confrontation Clause is subject to a harmless error analysis (see, Cruz v New York, 481 US, at 194, supra). Constitutional error is harmless only if it is harmless beyond a reasonable doubt (Schneble v Florida, 405 US 427, 431; Chapman v California, 386 US 18, 24; People v Hamlin, 71 N.Y.2d 750, 756; People v Almestica, 42 N.Y.2d 222, 226). The court's review of a constitutional error is based on the entire record, and involves a determination of the "probable impact of the codefendant's admission[ ] on the `minds of an average jury' " (People v Hamlin, 71 NY2d, at 758, supra, citing Harrington v California, 395 US 250, 254; see also, *277 People v Crimmins, 36 N.Y.2d 230, 237). The court must ascertain whether the confession so prejudiced the defendant that reversal of the conviction and a new trial is mandated (see, People v Hamlin, 71 NY2d, at 758, supra). Relevant considerations in this review include the comprehensiveness of defendant's statement and the extent to which it explains defendant's participation in the crime without reference to the codefendant's statement; whether the statement is corroborated or contradicted by objective evidence; and, whether defendant has repeated or repudiated the substance of the statement on subsequent occasions (see, Schneble v Florida, 405 US, at 431, supra; Cruz v New York, 481 US, at 191-192, supra; People v Hamlin, 71 NY2d, at 758, supra).
Particularly significant in our review of the nature of the error in the instant case is the impact of the codefendant's inculpatory statement on defendant's repudiation of his previous statements. At trial, defendant denied any involvement in criminal activity on the night of April 1, 1981, and stated that he did not remember any conversations with the detective or Assistant District Attorney at the hospital. Notwithstanding the finding of the suppression court that the statements were voluntary, defendant asserts that he repudiated his inculpatory statements at trial on the ground that they were neither voluntary nor reliable since they were obtained when his physical and mental capabilities were severely impaired after a seven-hour operation. In this regard, the probable impact of the codefendant's inculpatory statement on the mind of the average juror was extreme prejudice to defendant, eliminating any possibility that the jury would accept the defense theory.
It is the codefendant's inculpatory statement that supports defendant's conviction under a theory that each defendant was "aiding the other and acting in concert with another" because only the codefendant's statement links defendant to the crime and ascribes intent to him. Neither defendant's statements to the detective at the hospital nor his trial testimony do anything other than place defendant in the vicinity of the crime scene. His statements do not explain his presence at the scene nor reveal a plan or motive to commit a crime. It is the comprehensive nature of the codefendant's statement that provides the only support for defendant's conviction.
Likewise, while Barrett's hearsay statement that he may have shot one of his assailants accounts for the bullet recovered *278 from defendant's abdomen, absent codefendant Croney's statement, it too does nothing other than place defendant at the scene, a fact not changed by the ballistics evidence as suggested by the dissent. Moreover, the accuracy of Barrett's statement is itself hardly free from doubt given that the dying Barrett identified an alleged suspect who was not even at the scene.
We, therefore, conclude that defendant's conviction could have resulted only because his Sixth Amendment right of confrontation was abridged by the admission of the codefendant's inculpatory confession. As this error was harmful, defendant is entitled to a new trial.
Accordingly, the order of the Appellate Division should be reversed, defendant's CPL 440.10 motion granted, defendant's conviction of murder in the second degree and criminal possession of a weapon in the second degree vacated, and a new trial ordered.
BELLACOSA, J. (dissenting).
In my view, the order of the Appellate Division rejecting CPL 440.10 collateral review relief and unanimously upholding the 1982 judgment of conviction after a jury verdict finding defendant guilty of murder should be affirmed. The harmless error doctrine is applicable and our approved, standard analysis  employed by the Appellate Division in this case  is cogently supportable on the record (195 AD2d 572; People v Hamlin, 71 N.Y.2d 750, 758).
To begin with, appellant-defendant's own detailed, voluntary confession was admitted as direct evidence in this case. It brought before the jury his admission that before exiting the vehicle with one Carlos Richards, the shooter, defendant knew that Richards had a gun and that Richards intended to rob Barrett. Defendant also testified at trial that he was driving in the car with Richards before the shooting and that he himself was shot at the location where the robbery occurred.
To be sure, defendant tried to retreat at trial somewhat from his confession to mitigate his participation and knowledge in the crime and, thus, to exculpate himself from guilt. In no way, however, should defendant's testimony in this harmless error setting be characterized, as the majority does, as a "reversal of his previous position" (majority opn, at 272, n 3), singularly displacing the dispositive focus of this case, namely, the totality of the evidence and the impact of the erroneously admitted codefendant's confession. Defendant's self-serving, incomplete retraction becomes particularly significant *279 in this harmless error context, quite to the opposite effect from the crucial weight the majority gives it. The reason I advance for that conclusion is that the jury also properly heard compelling testimony from a police officer who arrived at the crime scene seconds after the shooting and spoke with the victim of the robbery, as he lay dying in the street.
That officer testified that victim Barrett was able to inform the police that he was robbed by three men and that he, the victim, "might have shot one of them." The ironclad link connecting the direct and circumstantial evidentiary components to defendant is soldered with an unbreakable lock of documentary, medical, scientific evidence  the expert ballistics evidence tying the defendant's wound to the victim's gun as its undeniable source and cause. Nothing could have impressed the jury more than the proof that the bullet removed from this appellant-defendant's abdomen was fired from victim Barrett's .38 caliber Smith & Wesson revolver. Defendant's wound from the dying victim's gun thus binds this defendant-appellant to this crime by way of the dying victim's statement that he shot one of his three assailants. In the vernacular, this ballistics evidence goes one better than even a "smoking gun," beyond peradventure of doubt.
People v Hamlin (71 N.Y.2d 750, 758, supra) teaches:
"In making [the harmless error] assessment, we consider a number of factors, including how comprehensive defendant's statement is and whether it satisfactorily explains his or her part in the crime without reference to the codefendant's statement, whether it is corroborated or contradicted by other objective evidence, and whether defendant has reiterated it on one or more subsequent occasions (see, Schneble v Florida, 405 US 427, 431, supra). If the defendant has repudiated the confession, a similar, detailed statement by a codefendant may be particularly prejudicial to the minds of a jury instructed to decide whether defendant's statement was voluntary (see, Cruz v New York, 481 US, at [191-192], 107 S Ct, at 1718, supra; People v Pitts, 71 N.Y.2d 923; cf., Schneble v Florida, supra)." (Emphasis added.)
Applying these criteria to this case, I emphasize the corroboration by objective scientific evidence in this case and I note the distinguishing feature of defendant's trial testimony, which *280 was not a "repudiation" but a newly spun, minimized version of his involvement in the crime. The majority, thus, mischaracterizes, overemphasizes and misapplies the latter component of the test.
Defendant's confession and his trial testimony acknowledgement of presence and other activity at the crime scene  he did not retract those central features in his trial testimony but, rather, confirmed them  and the dying victim's "testimony" through the officer propel this defendant's guilt beyond the sphere of reasonable doubt into the realm beyond a moral certainty. My examination of this record discloses no reasonable possibility (see, People v Crimmins, 36 N.Y.2d 230, 237) that the jury's assessment of appellant-defendant Eastman's guilt was in any cognizable way affected by the confession of the other codefendant (People v Hamlin, 71 N.Y.2d 750, 758, supra), whose confession under the retroactive application of Cruz v New York (481 US 186) should not have been admitted at defendant's trial.
Defendant was proved guilty beyond a reasonable doubt, and I am satisfied, as were the lower courts, that the belated collateral review of the Cruz error bears no reasonable possibility of having affected the jury's well-considered verdict of guilt based on the overwhelming proof, beyond a reasonable doubt, proffered against defendant.
Order reversed, etc.
NOTES
[1] The two counts of criminal use of a firearm in the second degree originally charged in the indictment were dismissed.
[2] In Bruton v United States (391 US 123) the Supreme Court held that a defendant is deprived of his rights under the Confrontation Clause when his codefendant's incriminating confession is introduced at their joint trial, even if the jury is specifically instructed to consider the confession only against the codefendant.
[3] Contrary to the view expressed by the dissent, defendant's retreat from his prior statements is significant in assessing the harmful effect of his codefendant's statement because it represents a reversal of his previous position.
[4] Confessions are interlocking if their content is substantially similar (see, People v Smalls, 55 N.Y.2d 407, 415).