**Daril AMAKER, Petitioner,**

v.

**Peter J. LACY, Superintendent, Bare Hill Correctional Facility, Respondent.**

No. CV–95–5195.

United States District Court, E.D. New York.

Aug. 26, 1996.

**1342**

Jeffrey I. Richman, Legal Aid Society, New York City, for Petitioner.

Caroline R. Donhauser, District Attorney's Office, Kings County, Brooklyn, NY, for Respondent.

## MEMORANDUM AND ORDER

TRAGER, District Judge:

This is a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 by Daril Amaker who is represented by counsel. Petitioner claims that he received ineffective assistance of counsel during his trial because *inter alia* his attorney did not object to the admission of a videotaped confession by his co-defendant which, the petitioner maintains, implicated him.

### Background

### (1) Procedural History

Petitioner was tried in New York State Supreme Court, Kings County beginning July 29, 1991. He was convicted of manslaughter in the first degree and on September 4, 1991 sentenced to the maximum allowed by law—a minimum of eight and one-third and a maximum of twenty-five years.

Prior to perfecting his direct appeal, petitioner, represented by counsel, filed a N.Y. C.P.L. § 440.10 motion to vacate his judgment of conviction claiming that he had been denied the effective assistance of counsel in that: (1) counsel failed to move to sever defendant's trial from that of his co-defendant Logan whose videotaped statement was admitted at their joint trial; (2) counsel failed to assure that co-defendant Logan's videotaped statement was effectively redacted; (3) counsel failed to "protect defendant from impeachment with the co-defendant's statement"; and (4) counsel failed to object to the prosecutor's use during summation of co-defendant's videotaped statement. Resp. Ex. B. The Supreme Court, Kings County (Beldock, J.), summarily denied the § 440.10 motion, on April 13, 1993, finding that all his claims could be raised on his, as yet unperfected, direct appeal. C.P.L. § 440.10(2)(b); Resp.Ex. D; Mem. Decision and Order, dated April 13, 1993. The decision went on to note that even if the court were to consider the merits of his claim, it would fail. The court recalled that prior to trial petitioner's counsel moved to sever, and after discussion in court, he had withdrawn the motion. The court found this withdrawal to be "a legitimate trial strategy." Resp.Ex. D at 1. Petitioner's application for leave to appeal this denial was rejected by the Appellate Division, Second Department, on May 26, 1993. Donhauser Aff. ¶ 11.

Petitioner then directly appealed from his judgment of conviction to the Appellate Division, Second Department on two grounds. First, he maintained that he received ineffective assistance of counsel. Specifically, he raised the same four grounds that were raised on the § 440.10 motion. Second, he claimed that his alleged absence when the court questioned sworn jurors regarding their ability to continue serving on the jury deprived him of his right to be present at all material stages of his trial. Resp.Ex. E.

After filing his brief in the Appellate Division, but prior to a decision on his direct appeal, petitioner, again represented by counsel, filed a second motion to vacate the judgment of conviction pursuant to C.P.L. § 440.10 motion. Resp.Ex. G. In this motion, dated October 22, 1993, petitioner claimed that at his trial the prosecution failed to disclose alleged *Rosario* material, specifically an autopsy audiotape, and therefore, that his conviction had to be vacated.

On December 27, 1993, while the Supreme Court was still considering petitioner's second § 440.10 motion, the Appellate Division unanimously affirmed his judgment of conviction. *People v. Amaker*, 199 A.D.2d 513, 608 N.Y.S.2d 109 (2d Dep't 1993). The Appellate Division stated: "Viewing the representation

of the defendant's attorney in its entirety, the defendant was afforded the effective assistance of counsel (*see People v. Rivera,* 71 N.Y.2d 705 [530 N.Y.S.2d 52, 525 N.E.2d 698]; *People v. Baldi,* 54 N.Y.2d 137, 444 N.Y.S.2d 893, 429 N.E.2d 400; *People v. Droz,* 39 N.Y.2d 457 [384 N.Y.S.2d 404, 348 N.E.2d 880]." *Id.* at 514, 608 N.Y.S.2d 109. Leave to appeal to the Court of Appeals was denied on March 10, 1994. *People v. Amaker,* 83 N.Y.2d 848, 612 N.Y.S.2d 380, 634 N.E.2d 981 (1994) (Smith, J.).

Five days later, on March 15, 1994, the Supreme Court denied petitioner's second motion to vacate his judgment of conviction determining that the motion papers were insufficient to warrant any relief. Resp.Ex. I, Mem. Decision and Order, dated March 15, 1994 at 2. Petitioner then applied for leave to appeal this decision to the Appellate Division, which, on April 13, 1994, denied his application.[1] Donhauser Aff. ¶ 17.

On October 25, 1995, more than a year after the denial of leave of his direct appeal to the Court of Appeals, petitioner filed this habeas corpus petition claiming that he was denied effective assistance of counsel because his defense counsel failed to protect him adequately from the prosecutor's use of the alleged inculpatory confession of a non-testifying co-defendant.[2] This, petitioner maintains, violates *Bruton v. United States,* 391 U.S. 123, 136, 88 S.Ct. 1620, 1628, 20 L.Ed.2d 476 (1968).

Petitioner's brief on his direct appeal to the Appellate Division is almost identical to the brief presented here. However, one difference has arisen here that was not presented to the state courts. Upon listening to the videotape confession, petitioner realized that the redaction was allegedly ineffective as the co-defendant, Logan, mentions petitioner's nickname, "Snake", on the tape. The assistant district attorney, in the midst of questioning Logan, asked: "Who were you with [when you returned to the corner where the shooting began]?" And, Logan replied: "There's me, Snake, I can't really tell, there was a whole bunch of us."

### (2) Pre–Trial

Amaker was arrested on April 3, 1990 and charged with a murder that occurred on March 31, 1990 in Kings County, New York. Pet'r Mem. at 1. He was indicted, along with Earl Logan and Cory Williams, for intentional murder in the second degree, reckless murder in the second degree, reckless endangerment in the first degree, criminal possession of a weapon in the second degree, and criminal possession of a weapon in the third degree. *Id.;* Donhauser Aff. ¶ 5. On June 11, 1990, Amaker's defense counsel, assigned to the case by the court, moved for a bill of particulars and discovery, inspection of the grand jury minutes, and for various pretrial hearings including one "as to the admissibility of any pre-trial statements." Pet'r Mem. at 5. That motion did not include a request to sever defendant's trial from that of Earl Logan. No written motion to sever appears in the court file or on the record. There was, however, an oral motion by defense counsel to redact Logan's videotape.

After the redaction process, defense counsel expressed to the court a fear that the detective who obtained co-defendant Logan's statement may inadvertently divulge redacted material during his testimony. Defense counsel noted that if co-defendant Logan's counsel elicited "any suggestions or innuendo or any answers come out indicating my client was present, I would be in the same situation I was if the statement were not redacted and I would ask for a mistrial and severance." Tr. at 169–70.

### (3) People's Case

Norshawn Mitchell testified that on the night of March 31, 1990, he was with Joseph

---

1. Subsequently, the Court of Appeals held that the medical examiner's autopsy tapes were not *Rosario* material. *People v. Carpenter,* 85 N.Y.2d 1016, 630 N.Y.S.2d 971, 654 N.E.2d 1219 (1995); *People v. Washington,* 86 N.Y.2d 189, 630 N.Y.S.2d 693, 654 N.E.2d 967 (1995).

2. At this point, it should be noted that with respect to the issues raised by petitioner and the

timeliness of his petition, this action is not subject to the Antiterrorism and Effective Death Penalty Act of 1996 as the Second Circuit has held that the act does not apply retroactively to habeas corpus petitions not involving death sentences filed prior to the statute's enactment. *Boria v. Keane,* 90 F.3d 36 (2d Cir.1996).

Richards, the victim, and other members of the Greene Avenue gang. Tr. at 489. At about 11:15 p.m., their group encountered the Gates Avenue gang, and an argument ensued. Trial Tr. at 490–91, 493. Petitioner Amaker, and co-defendants Earl Logan and Cory Williams, members of the Gates Avenue group, were there. *Id.* at 497–98. According to Mitchell, petitioner pointed at individuals in Mitchell's group and stated: "I kill you, you, and you." *Id.* at 512. After several additional minutes, petitioner swung a box cutter at the victim, Joseph Richards. *Id.* at 494, 499. "King," also a member of the Greene Avenue gang who was with Richards, then cut Amaker's coat with a knife. *Id.* at 499. The Gates Avenue group including petitioner then ran away. *Id.* at 500.

Later that evening, at the scene of the earlier argument, the Greene Avenue gang returned. Mitchell saw Amaker, the petitioner, co-defendants Logan and Williams and another individual down the street. *Id.* at 500. Mitchell testified that petitioner stepped from behind a car and started to fire a gun in the direction of where Mitchell's group was standing. *Id.* at 500–01. Mitchell was a block away from the shooter. Even though he had never seen petitioner before that evening and he could not see his face from where he was standing, Mitchell claimed that he could identify the petitioner as the shooter because the coat the shooter was wearing was the same as the one slashed in the first altercation and because the shooter was the same height and weight as petitioner. *Id.* at 501, 516. Mitchell ran when the gunshots were fired and, as he did so, saw Richards fall over wounded. *Id.* at 503–04. Mitchell later identified petitioner in a lineup. *Id.* at 508.

On cross-examination of Mitchell, petitioner's counsel brought out that immediately after the killing, Mitchell told the assistant district attorney investigating the homicide that he found Richards wounded only after he heard sirens. *Id.* at 527–28. Mitchell's explanation for the inconsistency was that he lied to the investigators at first because he feared being involved. *Id.* at 489, 528, 532.

Hayward Johnson, also a member of the Greene Avenue gang, testified that he was with Mitchell and Richards as well on March 31, 1990. *Id.* at 332, 334. He saw petitioner shoot at the Greene Avenue gang. *Id.* at 347–48, 407. Johnson also saw Logan with a gun and Williams holding his hands out as if he were shooting. *Id.* at 349–50; 375. He also believed that more than one gun was being fired. *Id.* at 376. Johnson recognized Logan, Williams and Gargumel, another member of petitioner's Gates Avenue gang but did not know petitioner.

Johnson admitted that he lied to the Grand Jury when he swore that only one person had a gun and that person was Earl Logan, *id.* at 409, and when he told the grand jury that the shooter was wearing a brown jacket. *Id.* at 410. In addition, during a lineup which included petitioner he did not identify petitioner as one of the shooters. His explanation for lying to the Grand Jury and prosecutors was that his gang originally had planned to "take care of" petitioner by themselves. *Id.* at 357.

Arlander Jones, a member of petitioner's Gates Avenue gang and a friend of petitioner, also testified for the prosecution. *Id.* at 299–311. He was present when petitioner and King began fighting and petitioner's coat was slashed. Significantly, he testified that after the coat was slashed, they all ran away. *Id.* at 302. He also implied that there were more than four members of the Gates Avenue gang at the scene. *Id.* at 300–04. He was not present at the time of the shooting.

Michael Richards, the brother of the victim, saw the argument from Gates Avenue. *Id.* at 38. He, too, recognized Logan and Williams out of a group of about ten to fifteen. He said he did not recognize the others. *Id.* at 39–40, 42, 59–60. He claimed that when the group returned, "Snake" (petitioner's nickname) was shooting a gun. *Id.* at 41. This is the only person that Michael Richards saw with a gun. *Id.* at 63, 104. However, when Richards was asked to point out "Snake" he pointed to and described Williams, a co-defendant who was acquitted.

Codefendant Logan, who did not testify, made a videotaped statement to police officers which at least indirectly inculpated petitioner. Detective Parker introduced the vid-

eotape of Logan's confession into evidence. *Id.* at 163. By agreement, all references to "Snake" were to be redacted as well as "some other sentences and answers which [defense counsel] objected to ..." *Id.* at 165. Petitioner's counsel raised concern over use of the pronoun "he" or the term "a person" when references to "Snake" were being eliminated. *Id.* at 166. He explained that "[t]he other witnesses puts [sic] my client together with Logan." *Id.* at 171. Therefore, petitioner is the other "he.... That's what I'm saying. That's what was redacted in the video ..." *Id.* at 171. And, but if he says, "he" meaning someone else did it, ... with the fact that Corey [Williams] wasn't there, who are they going to conclude the "he" was? *Id.* at 172.

The court informed the jury that the tape had been redacted and that the jury did not need to be concerned with the "missing portions." It further instructed the jury that this was the statement of Earl Logan and that "such evidence is not applicable to nor is it binding upon any of the other defendants." *Id.* at 176–77.

In the videotape, Logan described how he fought with the other group and then went to a party in which an individual named Black "gave us" guns. "All of us had guns who went back down there [referring to the intersection where the fight occurred]." *See* Videotape.

On the videotape, the prosecutor first asked Logan if he was at the corner of Greene and Stuyvesant Avenues at the time of the shooting. When he responded affirmatively to that question, Logan then was asked by the district attorney who was at the crime scene. Logan answered: "Me, Snake, I can't really tell there was a whole bunch ..." This reference to Snake was to be redacted, but evidently escaped notice by the court, prosecutor and defense counsel. In fact, only while reviewing the tape for the habeas petition, was this reference discovered.

Logan's confession recalled how the two groups met for the second time that evening. The groups were at different ends of the street and each group did not see the other group. Thus, "we were getting ready to go

home ... and then 'he' had saw [sic] them, and that's when he started shooting." Videotape. The "he" in this statement was one of the redactions of Snake's name in Logan's videotape confession.

Logan then stated numerous times that he himself did not "sho[o]t at them," and said that he could bring witnesses in "to tell you I didn't do nothing." Videotape. He also claimed that Corey Williams was not at the scene until after the shooting occurred.

Detective Parker then testified identifying the blue coat that was slashed with a knife and worn by petitioner when he came into the precinct on April 3. Tr. at 184.

Finally, Esau Crosland, another member of the victim's Greene Avenue gang, witnessed the shooting and testified that there were normally about six guys in the petitioner's group. *Id.* at 253. He then described the argument between "Snake" and "King" which ended in the cutting of petitioner's jacket. *Id.* at 257.

#### (4) Defense Case

Petitioner testified in his own defense. Unlike all of the People's eyewitnesses, petitioner had never been convicted of a crime. He testified that on the night of this incident, he argued with King and King's gang. Tr. at 632, 636. He claimed that during that argument, Joseph Richards, the victim, grabbed petitioner as he tried to walk away and, consequently, petitioner pulled out a razor in order to escape. *Id.* at 634. As petitioner was running away, he heard gunshots. *Id.* at 635–36. Petitioner maintained that he did not have a gun that night, that there was only one interaction between him and King's gang, and that he did not shoot Joseph Richards. *Id.* 648, 657. Rather, he claimed that the shots were fired from King, the "bully" in the victim's Greene Avenue gang, and others in King's group. *Id.* at 698. Petitioner also stated: "I had an argument with a group of boys from Greene Avenue and I was stabbed under the coat. And, you know, they had tried to stab me. I got away, I ran home." *Id.* at 632. He acknowledged that Priest, Arlander, Gargamel and Jesse were with him. *Id.*

On cross-examination of petitioner, disregarding the court's earlier instruction to the jury that Logan's videotape was evidence only against Logan, the prosecutor used Logan's videotape statement against petitioner. The prosecutor asked petitioner:

Q. Now, you watched the videotape of Priest [Logan's nickname] ... correct?

A. Yes, I did.

Q. Priest said that he came back and had a gun, is that correct?

A. Excuse me?

Q. He said he went back to that area with a gun?

A. I guess so.

Q. You weren't with him at that time, is that correct?

A. No, I wasn't.

*Id.* at 652. There was no objection by defense counsel.

The prosecutor then asked for an explanation of Logan's videotape:

Q. You talked to Priest the next day?

A. I don't think so.

> .　　.　　.　　.　　.

Q. But during the course of the trial in coming to trial and court dates, you meet in court, don't you?

A. Yes.

Q. Have you ever talked to him about the case?

A. Sometimes.

Q. And, when you discussed the incident that night, did you ever ask him about the statement he made to the police?

A. No.

Q. Never brought it up?

A. Um, a long time ago.

> .　　.　　.　　.　　.

Q. Now, you were in court a couple of times when you saw this statement made, right?

A. Yes.

Q. What was the conversation at that time?

A. I asked him why he made that statement.

Q. Because you have no idea what he's talking about, right?

A. Yes.

Q. And, did he tell you why he made the statement?

A. Um, he told me because my baby's mother took the police to his house.

Q. And that's why he made that statement?

A. Yes.

Q. Because the police—your baby's mother took the police to his house?

A. And he got scared.

Q. And he told them he was firing a gun on Greene at Joe Richards, right?

CO–COUNSEL: Objection, Your Honor

THE PROSECUTOR: I'll rephrase it, Judge.

Q. He told them he had a .380 automatic, went to Greene Avenue and held his gun in the direction of the people on the corner, right?

CO–COUNSEL: Objection.

THE COURT: Overruled.

Q. Did he tell you that?

A. He didn't tell me what kind of gun he had. He was telling me about his statement.

Q. And he made that statement because he was scared?

A. He said he was promised to go home at the precinct.

Q. And if he confessed to homicide, he could go home, right?

A. Yes.

Q. And Priest is the type of guy if he had the option of confessing to homicide, or going home, he'll confess to homicide, is that right?

CO–COUNSEL: Objection

THE COURT: Objection Sustained.

Q. Now, when Priest said "All of us went back and got guns," that would be a lie, right?

A. Yes.

Tr. at 664–669.

### (5) Summations and Verdict

Logan's counsel conceded that Logan had a gun that night, but argued that he did not fire it. Tr. at 774. Logan's counsel argued that Logan did not shoot the gun and, furthermore, that the videotaped confession was not voluntary. Tr. at 756–773. Co-defendant Williams' attorney urged the jury to conclude that his client was not present at the shooting. Tr. at 805.

Petitioner's counsel submitted to the jury that all those who claimed to have seen petitioner at the scene were admitted liars. Tr. at 793–94. His only mention of the videotape was acknowledging that it was shown. *Id.* at 781. Then, he stated that petitioner was at the scene, but was not the shooter. *Id.* at 788. Petitioner's presence at the scene, with a group of other boys, was not enough to convict him. *Id.* at 795.

The prosecutor relied heavily upon Logan's statement to establish petitioner's guilt. To refute petitioner's testimony that he was being shot at by the victim's gang, the prosecutor argued that his testimony was inconsistent with the videotape—it was an "outright lie." Tr. at 822. The prosecutor continued: "Priest [defendant Logan], in his video statement, never says they shot at him." *Id.* Further, relying on Logan's statement that "I had my gun out, but I didn't shoot. I got two guns from Black at a party," [3] the prosecutor urges the jury to believe that the petitioner was the shooter. Tr. at 848. The prosecutor reiterated another few times Logan's statement that everyone involved had guns; that another guy was shooting—not Logan. Tr. at 852, 854, 856, 859. He also argued that Priest never stated in his video—they shot at us which the prosecutor maintained he would have said, if true. In this way, the prosecutor tried to emphasize that petitioner is a liar. *Id.* at 822.

During the jury's deliberations, the videotape of Logan's statement was played twice upon the jury's request. *Id.* at 936, 939.

Petitioner and Logan were acquitted of the murder charges, but convicted of the lesser included charge of manslaughter in the first degree on September 4, 1991. Tr. at 1104–05. They received the maximum sentence which is a minimum of eight and one-third years and a maximum of twenty-five years incarceration. Tr. of Sent. of Earl Logan, 9/23/91, at 8. Co-defendant Williams was found not guilty.

### Discussion

#### (1)

Petitioner requests habeas corpus relief on the basis of ineffective assistance of counsel in failing to obtain either a severance or the exclusion of Logan's statement and the failure to object to the prosecutor's improper use of Logan's confession both when cross-examining petitioner and when arguing in summation. In order to prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate that: (1) his attorney's performance fell below an "objective standard of reasonableness," and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the [trial] would have been different." *Strickland v. Washington,* 466 U.S. 668, 687–88, 694, 104 S.Ct. 2052, 2064–65, 2068, 80 L.Ed.2d 674 (1984); *Kieser v. New York,* 56 F.3d 16, 18 (2d Cir.1995); *Cuevas v. Henderson,* 801 F.2d 586, 589 (2d Cir.1986), *cert. denied,* 480 U.S. 908, 107 S.Ct. 1354, 94 L.Ed.2d 524 (1987). Not only must counsel's performance be so deficient to demonstrate s/he was not functioning as counsel, but also that counsel's deficient performance deprived the defendant of a fair trial. *Id.* at 687, 104 S.Ct. at 2064. There is a strong presumption that counsel's conduct fell within the wide range of reasonable assistance and that under the circumstances, counsel's actions were sound trial strategy. *Cuevas v. Henderson,* 801 F.2d at 589–90.

■■■■ Defense counsel argued for and obtained a redaction of co-defendant Logan's statement rather than severing the cases.

---

**3.** This and other "direct quotations" form Earl Logan's videotaped statement are actually the

prosecutor's paraphrase of Logan's words.

Petitioner maintains that a move to sever by defense counsel was required by *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). *Bruton* created a federal constitutional right to confrontation which applies to state trials. *Roberts v. Russell*, 392 U.S. 293, 294, 88 S.Ct. 1921, 1922, 20 L.Ed.2d 1100 (1968). The New York Court of Appeals has similarly held: "As the fundamental right embodied in the Confrontation Clause is the right to cross-examine one's adverse witness, it is nothing short of a denial of due process to rely on a jury's presumed ability to disregard a codefendant's confession implicating another defendant when the jury is determining the latter defendant's guilt or innocence." *People v. Eastman*, 85 N.Y.2d 265, 274, 624 N.Y.S.2d 83, 648 N.E.2d 459 (1995) (citations omitted). Further, that court explained: "The court's review of a constitutional error is based on the entire record, and involves a determination of the 'probable impact of the codefendant's admission[ ] on the minds of an average jury'." *Id.* at 276, 624 N.Y.S.2d 83, 648 N.E.2d 459 (citations omitted).

To protect a defendant's right to confrontation, the prosecutor can: (1) not offer the co-defendant's statement into evidence; (2) request separate trials; or, (3) redact the statement to eliminate any inculpatory reference to the defendant. *See Richardson v. Marsh*, 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987). The New York Court of Appeals in *People v. Payne*, 35 N.Y.2d 22, 27, 358 N.Y.S.2d 701, 315 N.E.2d 762 (1974), discussed the difficulty of a jury at a joint trial dealing with a confession by one defendant which should be disregarded when considering the other defendants:

> This poses a special problem for the jury and an obvious threat to the defendant's right to a fair trial.... the jury must perform the delicate task of sorting out the evidence which applies to each of them, but not necessarily the others. The defendant then runs the risk that, despite the court's instructions on this point, the jury may inadvertently, perhaps willfully, follow the

natural inclination to consider all the evidence taken at a single trial as evidence against all of the defendants collectively.

■ Nevertheless, an effective redaction is a proper way to protect defendant's confrontation rights. *People v. Wheeler*, 62 N.Y.2d 867, 869, 478 N.Y.S.2d 254, 466 N.E.2d 846 (1984). Not only must the defendant's name be eliminated in the redaction process, "but any reference to his or her existence" must be eliminated. *Richardson v. Marsh*, 481 U.S. 200, 211, 107 S.Ct. 1702, 1709, 95 L.Ed.2d 176 (1987). Similarly, the Second Circuit has held:

> To implicate the defendant's confrontation right, the statement need not have accused the defendant explicitly but may contain an accusation that is only implicit.

*Mason v. Scully*, 16 F.3d 38, 42–43 (2d Cir. 1993). The Second Circuit went on to give an example of an earlier case in which an officer testified that the codefendant had admitted committing fifteen robberies and named nine accomplices. Though the officer did not state the nine names the codefendant provided, "the clear implication was that the defendant was one of those named." *See United States v. Danzey*, 594 F.2d 905, 917–18 (2d Cir.), *cert. denied*, 441 U.S. 951, 99 S.Ct. 2179, 60 L.Ed.2d 1056 (1979); *see also People v. Wheeler*, 62 N.Y.2d 867, 478 N.Y.S.2d 254, 466 N.E.2d 846 (1984) (despite the fact that a third person was on trial, the use of the term "we" instead of all references to the co-defendants' names was not considered neutral when referring to one of two brothers on trial); *People v. Hussain*, 165 A.D.2d 538, 568 N.Y.S.2d 966 (2d Dep't 1991) (where the codefendant was the brother of the defendant and all references to the brother by name were changed to use the term "cousin" the redaction was found to be ineffective).

■ Petitioner argues that a similar violation occurred here when on the tape a prosecutor asked Logan how many guns he took from his acquaintance Black, and Logan answered two.[4] Petitioner maintains that this

---

4. The exact transcript is as follows:

> Black gave us two guns. We went ... no, he had gave us two guns ... he went and got

> some more. All of us had guns who went back down there.
>
> Q. You say all of us ...

statement demonstrated that Logan and petitioner had guns. These statements, however, ignore the fact that Logan also said: *"all of us had guns who went back down there"* and that Black gave guns to two of them and "got some more", *see* Videotape (emphasis added); State's Mem. at 28, and that after the shooting, Logan said that he gave the gun back to Black and "we all came back. The whole bunch of us." The fact that many people were described as present at the scene by the witnesses as well as by petitioner contradicts the notion that Logan had to be referring to the petitioner. *See* Tr. at 341, 492; and 632, 639, 640.

■ In further reviewing Logan's videotape, petitioner points out that when Logan was asked by a prosecutor what his role in the crime was, Logan answered that he was at the scene with a gun, but did not shoot. Petitioner argues that this statement strongly implies that the shooter was the petitioner. According to petitioner's present counsel, the implication was furthered by the prosecutor's summation tying Logan and the petitioner together. The prosecutor made numerous references to the videotape and its credibility. He explained that Logan, contrary to what petitioner claims, never said that he was shot at by the victim's gang. Tr. at 822. He further repeats numerous times Logan's statement that he was at the crime scene with his gun but did not shoot. Tr. at 850–54. Consequently, petitioner asserts that such redaction was ineffective. The replacement of petitioner's nickname with a pronoun did not, petitioner asserts, safeguard his constitutional right to confrontation as the jury could still interpret the statement to inculpate petitioner. *See People v. Wheeler, supra.*

The State, however, properly distinguishes *People v. Wheeler,* 62 N.Y.2d 867, 478 N.Y.S.2d 254, 466 N.E.2d 846 (1984), by showing that in *Wheeler* the co-defendants were brothers; thus the use of the term "we" could not be considered neutral. *People v. Hussain,* 165 A.D.2d 538, 568 N.Y.S.2d 966 (2d Dep't 1991), is similarly inapposite as again the two were brothers; thus the use of the term "cousin" could not be considered neutral.

■ Petitioner also claims that there was no strategic advantage for a joint trial. He says that the defense's theory in the case was that petitioner was present but not culpable, and such a theory is only undermined by Logan's statement. Even if a joint trial was not preferred, the fact remains that defense counsel focused on obtaining, and did obtain, the relief of redaction rather than pursuing what was probably the unrealistic goal of obtaining a severed trial. *See United States v. Holmes,* 44 F.3d 1150, 1158–59 (2d Cir. 1995) (rejecting defendant's claim that he received ineffective assistance because counsel did not move to sever trial from co-defendant's, and noting that severance motions were rarely granted and convictions rarely reversed on grounds that a severance motion was improperly denied). Moreover, petitioner's trial attorney himself noted that if he was dissatisfied with the redaction or there were occurrences during the trial that he felt prejudiced his client, he would request severance during the course of the trial. Tr. at 169–70. These actions do not evidence incompetence.

Furthermore, pre-trial, petitioner's trial counsel had already begun using a "misidentification" strategy. He moved for a *Wade* hearing, challenging the use of Norshawn

A. I know Corey had a gun too ... and Corey came later.
Q. What type of gun did he give you?
A. Like two 380's.
Later, Logan explained the shooting incident itself:
Q. Where did you start shooting? ...
A. ... at first we ... looked for them. We were up Greene Avenue and we came back down Greene Avenue. And, we didn't see them. And we were getting ready to go home ... and then he had saw them, and that's when he started shooting.

Then, Logan admitted that Williams was not at the scene during the shooting:
Q. Your gun was automatic?
A. Yeh.
Q. So was his?
A. Yeh.
Q. Was Corey there at the time?
A. Corey came later, after that.
Q. After the shooting?
A. Yeh (nodding).

Mitchell's identification of petitioner in a line-up at trial. Tr. of Hrg. at 2. It might well be that counsel may have reasonably determined that it would be helpful if petitioner were tried with two other gang members in order for him to deflect the responsibility for the shooting onto someone else, rather than have the jury focus on the evidence against petitioner.

Thus, in denying defendant's § 440.10 motions, the court stated: "It appears to this Court that the decision to withdraw the motion for severance served a legitimate trial strategy by retaining defendant's trial with that of the co-defendants who appeared to be the more culpable actors." Ex. D (April 13, 1993, Memorandum Decision and Order). At a hearing on this matter, the state argued that petitioner's trial counsel first strategy "was that no reliable witness could place a gun in defendant's hand. And if the shooting had been done by a Gates [Avenue] member, it was someone other than the defendant. So that [defense counsel] was pursuing a misidentification defense." Hrg. Tr. at 17.

In pursuing this defense, counsel's opening included a request to the jurors to carefully consider the witnesses' reliability and honesty. Tr. at 32–33. In addition, counsel effectively cross-examined many of the prosecution's witnesses. For example, he forced Hayward Johnson, in his cross-examination, to admit that he had not identified petitioner in the grand jury thereby making Johnson appear either as a liar or as one who cannot properly identify the individual who shot Joseph Richards. Id. at 402–09. Similarly, when cross-examining Norshawn Mitchell, defense counsel made the point that Mitchell had never seen petitioner before the night of the shooting and that at the time of the shooting, he could not see the face of the shooter. Id. at 516–19. Detective Donawa, on cross-examination, testified that Mitchell had not originally given a description of the shooter in a snorkel coat, but rather in a brown leather jacket. Id. at 598. All of these admissions bolstered defense counsel's misidentification theory. Counsel cannot be

faulted for pursuing a losing strategy especially when the strategy was undermined by the defendant's last-minute decision to testify against the advice of his attorney.[5] See Tr. of proceedings, dated 5/30/96 at 39; People v. Baldi, 54 N.Y.2d 137, 146, 444 N.Y.S.2d 893, 429 N.E.2d 400 (1981). In so doing, petitioner irretrievably reduced the effectiveness of any misidentification strategy. Counsel was left with no choice but to adopt an approach relying on reasonable responses to petitioner's testimony.

Petitioner's testimony undermined the misidentification theory by freely admitting that he argued with Joseph Richards and "King" that evening and that his coat was slashed, after which the Greene Avenue gang allegedly shot at him. However, no witness—including Arlander Jones, a member of petitioner's gang—corroborated this version of events. Tr. at 300–04. At the same time, petitioner's testimony corroborated the motive for the shooting and made it difficult for his counsel to continue to argue that he was misidentified. Thus, defense counsel was left with the difficult course of attempting to demonstrate that his client's version of the events was truthful.

■ Were the issue only defense counsel's failure to move for a severance or the failure to assure an error-free redaction of a not very audible reference to petitioner's nickname, there would be no basis to fault counsel. However, there remains the issue of whether defense counsel acted with professional competence when he did not object to those portions of prosecutor's cross-examination of petitioner and his summation which mentioned the videotape. The State argues that "defense counsel may have reasonably concluded that, in a credibility contest between his client and co-defendant Logan, defendant would win if he answered the prosecutor's questions head on, rather than giving the appearance of avoiding them through his counsel's objections." State Mem. at 36–7. Similarly, the State maintains that the deci-

---

5. Petitioner's trial counsel noted on the record that "after reviewing the entire case and the weight of the evidence that came out against my client, I advised him not to testify. However, he wants to testify and it's his choice. So I just want the record to be clear that he's testifying against my advise [sic]." Tr. at 628.

sion of petitioner's counsel not to object to the prosecutor's summation was entirely reasonable as he did not want to draw attention to the comment by objecting to it. State Mem. at 40.

However, this explanation is not satisfying. It only explains why defense counsel did not object in front of the jury. It does not explain why he did not request a sidebar conference or at a break in the trial voiced his objection to the court over the prosecutor's conduct. At one of these occasions, he should have moved for a mistrial, or at a minimum corrective instructions, as the prosecution clearly overstepped its bounds. This serious error by defense counsel constitutes a basis for finding the first part of the *Strickland* test satisfied—that petitioner's attorney's conduct fell below "an objective standard of reasonableness." *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068.

(2)

██ Thus, petitioner has met the first element of the *Strickland* test. However, he has not met the second. Even if trial counsel is to be faulted for not objecting to the prosecution's improper questioning of petitioner or his summation, the result would not have been different. A writ of habeas corpus must only issue if the petitioner can show that a reasonable probability exists that without counsel's errors the result of the proceeding would have been different. *Kimmelman*

*v. Morrison,* 477 U.S. 365, 375, 106 S.Ct. 2574, 2582, 91 L.Ed.2d 305 (1986).

Petitioner relies heavily on the Second Circuit's decision in *Mason.* Without the codefendant's statement being heard

the outcome of the trial would likely have been different. The State's evidence against Mason was certainly not overpowering. There was no physical evidence, such as fingerprints, against him. None of the three eyewitnesses who testified could specify any distinguishing characteristic that would have permitted them to identify Mason. Two of those witnesses had not identified him prior to trial and did so only at trial when he was the obvious choice, being the only black male at the counsel table....

*Mason,* 16 F.3d at 45.

Again, this case is easily distinguishable as many of the eyewitnesses who testified here could specify distinguishing characteristics of petitioner and in fact knew him for a long period of time.

██ The State points out that while jury instructions are not always followed, they are helpful. Here, the trial court cautioned the jurors when the videotape had been played that they should not consider the statement against any of the defendants except Logan.[6] Tr. at 176–77. Second, the

---

6. The fact that the jurors heard the videotape twice during deliberations does raise concern that someone on the jury may have heard Snake's name. On the other hand, the court declined to provide a transcript of the videotape. But even if a juror heard this reference and informed the other jury members, the reference is not prejudicial. The question asked was "who were you with?" Snake himself testified that he was at the corner of Greene and Stuyvesant the night of the incident. In addition, the crucial question for the jury to determine was who was doing the shooting not whether the petitioner was at the scene. Petitioner's counsel now contends that the use of the pronoun "he" is now even more problematic due to the single reference to Snake which the "he" refers to. However, Logan in his statement mentions many people by name when asked whom he was with that evening; thus the various reference to "he" could refer to any of them. If the jurors did hear the nickname "Snake," they might expect to hear it again in other answers and not necessarily conclude that, on the crucial question of who

was shooting the gun, that when Logan used the pronoun "he," he was referring necessarily to one of his identified co-defendants. Moreover, it is just as likely that the jury was properly reviewing the videotape to determine Logan's guilt and whether murder or manslaughter was the appropriate finding. In addition, the fact that no one pointed out the reference earlier could be seen in one of two ways. Either it demonstrates that petitioner's trial counsel was ineffective or it was difficult for anyone including the judges to hear the name. As discussed above, there was no prejudice to petitioner even if petitioner's nickname was heard by the jury.

The State also argues that as this newly found reference was never raised in the state court, petitioner has not exhausted his remedy and either he must withdraw the argument or the petition must be dismissed. Tr. of Hearing, dated 5/30/96, at 24. Although a habeas petitioner can somewhat reformulate his claims, they must be essentially the same as those presented in state courts. *Tamapua v. Shimoda,* 796 F.2d 261 (9th Cir.1986). "So long as a defendant presents the

State argues, the two witnesses, Mitchell and Johnson, who identified the petitioner as the shooter, were thoroughly cross-examined. Tr. at 347. Neither of these arguments are persuasive. The first contention is at war with *Bruton.* A charge to the jury is not sufficient to overcome the issue raised by Logan's confession. The second argument is relevant only on the issue of effectiveness of defense counsel.

Nonetheless, what is persuasive is that it was not the prosecutor's improper cross-examination or summation that convicted petitioner. The problem with the defense's case was, that, contrary to his attorney's advice, defendant decided to testify. It not only undermined counsel's misidentification defense, but, more importantly, petitioner's testimony was completely inconsistent from everyone else's including that of his friend, Arlander Jones. Equally significantly, petitioner's version of the events actually served to corroborate the State's theory that he had an altercation with Richards and had a motive for the shooting. State Mem. at 35. The result inevitably was a conviction, and the elimination of the prosecutor's misconduct would not likely have led to a different result. This case aptly reminds one of a comment by the late Judge Sterry R. Waterman: "[R]espect for individual autonomy requires that [the defendant] be allowed to go to jail under his own banner if he so desires and if he makes the choice 'with his eyes open.'" *United States v. Denno,* 348 F.2d 12, 15 (1965). And, that's what the petitioner, here, chose to do. Here, too, it was not petitioner's trial counsel's error that resulted in his conviction, but petitioner's decision to offer an incredible version of the events of March 31, 1990.

In sum, while I am not in agreement with the Appellate Division's determination that the defendant was afforded effective assistance of counsel, I do find the mistakes made

state courts with all the operative facts giving rise to the asserted constitutional principle, we have held that it would be unnecessary for him to cite to the state court book and verse on the federal constitution." *Chacon v. Wood,* 36 F.3d 1459 (9th Cir.1994). Here, the one muffled reference to petitioner by Logan in Logan's videotape is not an essential fact which the state should be required to review in order to deter-

by petitioner's counsel had no material effect on the outcome.

### Conclusion

For the reasons stated above, petitioner's request for a writ of habeas corpus is denied. A Certificate of Appealability is denied. The Clerk of the Court is directed to close the case.

SO ORDERED.

mine the ineffective assistance of counsel claim. The one reference to petitioner assuming the jury heard it, had little effect when viewed against the background of the extremely inconsistent testimony which petitioner gave from all of the other witnesses, including a friend who did not attempt to implicate him. No one else offered a version of events that came anywhere close to petitioner's.